# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AETNA LIFE INSURANCE COMPANY,

        Plaintiff,

          v.                                CIVIL ACTION

HUNTINGDON VALLEY SURGERY CENTER,
et al.,                                  No. 13-03101
              Defendants.

# MEMORANDUM

YOHN, J.                                               April 30, 2015

      In 2013, Aetna Life Insurance Company sued Huntingdon Valley Surgery Center, alleging that it engaged in an illegal kickback scheme to induce patient referrals. After I denied most of Huntingdon Valley's motion to dismiss this complaint, it filed an answer and eight counterclaims. Put simply, in the counterclaims, Huntingdon Valley contends that Aetna has consistently underpaid it for its services to Aetna members and also interfered with its prospective contractual relations with Aetna members and with doctors in Aetna's network. Aetna has moved to dismiss all eight counterclaims on a variety of grounds. For the following reasons, I will dismiss Huntingdon Valley's claim for ERISA benefits (Count VIII) but otherwise deny the motion.

# I.      Factual and Procedural Background[1]

## A.      Aetna's Network and Huntingdon Valley

Aetna is a Connecticut corporation that provides health insurance to its members located throughout the United States.  Countercl. ¶ 5.  To that end, it has created a network of medical providers by contracting with physicians and facilities across the country.  *Id.* ¶ 8.  Under these "Provider Agreements," the "in-network" providers—physicians and facilities—administer services to Aetna members at reduced rates negotiated between the provider and Aetna.  *Id.*

Some Aetna members choose to purchase plans that provide not only in-network health benefits but also out-of-network benefits.  *Id.* ¶ 6.  That means Aetna insures the members for covered services even if they use an out-of-network physician or facility, or both.  *Id.*  But when these Aetna members opt to use out-of-network providers, the providers can bill Aetna at their full "charge master" prices, rates set by the providers that are usually higher than the rates that Aetna negotiated with its in-network providers.  Huntingdon Valley's Resp. 1.[2]

Huntingdon Valley is an outpatient ambulatory surgery center that is an out-of-network facility for Aetna members.  Countercl. ¶¶ 4, 7.  After Huntingdon Valley learns that an Aetna member wants his or her procedure to be performed there, it informs Aetna that an Aetna member is coming there for a procedure.  *Id.* ¶ 13.  With this contact, Huntingdon Valley ensures that Aetna knows that Huntingdon Valley is out-of-network and confirms that the Aetna member's plan includes out-of-network benefits.  *Id.*  After Aetna approves Huntingdon Valley as an out-of-network facility, Huntingdon Valley typically obtains a claim assignment from the

---

[1] Under the applicable standard of review, which is set out below, I must accept as true all well-pleaded factual allegations made in the counterclaims.  *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996).

[2] Aetna could, of course, in its contract with its member limit the amount it would pay for a particular procedure, which would leave the balance of the charge master prices as the responsibility of the patient.

Aetna member. *Id.* ¶ 14. This claim assignment allows Huntingdon Valley to garner payment directly from Aetna for its services to Aetna members. *Id.*

  **B.**  **The Rates Huntingdon Valley Alleges Aetna Was Obligated to Pay**

  Although Huntingdon Valley is out of Aetna's direct network, it is part of two other networks that Aetna can tap for reduced rates: the Beech Street and Multiplan networks. Beech Street and Multiplan created their own networks of providers like Huntingdon Valley that agree to accept reduced rates for their services, and they gave insurance companies like Aetna the right to access their networks for a fee. *Id.* ¶¶ 22–28, Exs. A–D.

  Each network arrangement was created through two agreements. First, Beech Street and Multiplan entered into agreements with providers like Huntingdon Valley that memorialized the discounted rates at which these providers were willing to be reimbursed by "payors" like Aetna. Specifically, Huntingdon Valley became an in-network provider with Beech Street by entering into an "Ancillary Service Agreement" with Beech Street (Beech Street Agreement). *Id.* ¶ 23. Under that agreement, Huntingdon Valley agreed to "be reimbursed" 80% of its charge master rate, less applicable co-payments, deductibles, and co-insurance usually paid by the patient. *Id.* ¶ 24, Ex. A. Huntingdon Valley entered into a similar agreement with Multiplan (Multiplan Agreement), though in it Huntingdon Valley agreed to be reimbursed 75% of its charge master rate, less applicable payments usually paid by the patient. *Id.* ¶¶ 27–28.

  Second, payors like Aetna entered into agreements with Beech Street and Multiplan that gave them access (for a fee) to these networks. Aetna gained access to Beech Street's providers and their discounted rates by signing a "Network Rental Agreement" with Beech Street, agreeing to pay such rates directly to the providers. *Id.* ¶ 25, Ex. B. Aetna likewise earned access to Multiplan's network of providers and their discounted rates by signing an "Access Agreement"

with Multiplan.  *Id.* ¶ 28.  Of course, under the Network Rental Agreement and the Access

Agreement, Aetna had to pay providers like Huntingdon Valley the discounted rates only for

"Covered Services," which "means the health services covered pursuant to a[n Aetna] Plan."  *Id.*

Ex. D, at Aetna/HV 167995; *Id.* Ex. B, at Aetna/HV 136468, 136479.

### C.      The Rates Huntingdon Valley Alleges Aetna Paid

Over the years, Huntingdon Valley has provided services to Aetna members.  Countercl.

¶ 4.  Aetna, however, has failed to pay it the rates required by the Beech Street arrangement and

the Multiplan arrangement.  Until the end of 2012 or beginning of 2013, Aetna paid Huntingdon

Valley approximately 45% of the amount billed by Huntingdon Valley, less applicable

deductibles, co-insurance, and co-payments.  *Id.* ¶ 61.  Aetna thereafter began paying

Huntingdon Valley much less than this amount.  *Id.* ¶¶ 39, 61.

Some of these Aetna members received services at Huntingdon Valley under Aetna plans

governed by the Employee Retirement Income Security Act (ERISA), but some did not.  *Id.* ¶ 4.

Of the ERISA-covered members, some were covered by an ERISA plan that Aetna funded

(fully-funded plan), others by an ERISA plan that a plan sponsor (like an employer) funded but

Aetna administered (self-funded plan).  *Id.*  The non-ERISA-covered members were covered by

Aetna plans they bought on the individual market.  *Id.*

### D.      Aetna's Alleged Threats to Huntingdon Valley's Physician Owners

Besides underpaying Huntingdon Valley, the counterclaims allege that Aetna threatened

some of the physicians who serve both as limited partners in Huntingdon Valley and as

physicians in Aetna's network.  Twenty-two physicians serve as limited partners in Huntingdon

Valley, at least some of whom are also in-network physicians for Aetna.  *Id.* ¶¶ 4, 9.  Under their

Provider Agreements with Aetna, they can service Aetna members at out-of-network facilities if

4

pre-approved by Aetna, a right they invoked at times by referring cases to Huntingdon Valley. *Id.* ¶¶ 10, 35.

Around 2010, Aetna developed a plan to intimidate these physician partners who were referring cases to Huntingdon Valley. *Id.* ¶ 34. To further this plan, Aetna at some later time sent them letters threatening to cancel their Provider Agreements if they did not stop referring Aetna cases to Huntingdon Valley and providing services there. *Id.* ¶ 35.[3] Aetna told them that their Provider Agreements required them to refer Aetna patients to in-network facilities and that they were violating their agreements with these referrals. *Id.* ¶ 36. With these statements, Aetna misrepresented the terms of the physician owners' Provider Agreements. *Id.* ¶ 38.

### E.     Huntingdon Valley's Claims

On September 3, 2014, Huntingdon Valley filed eight counterclaims against Aetna. In Count I, it claims unjust enrichment based on Aetna's alleged underpayments on the bills of patients covered by Aetna's out-of-network benefits other than the Beech Street and Multiplan patients. In Counts II and III, it claims breach of contract and unjust enrichment, respectively, based on Aetna's alleged underpayments on the bills of Beech Street patients. It claims the same in Counts IV and V, except these claims are limited to the bills of Multiplan patients. In Counts VI and VII, Huntingdon Valley asserts interference with prospective economic relations based on Aetna's letters to its physician partners. Lastly, in Count VIII, Huntingdon Valley makes a claim for ERISA benefits.

Aetna moved to dismiss these claims. About two weeks later, Huntingdon Valley filed a response, to which Aetna soon replied. Huntingdon Valley then filed a sur-reply. With all briefing submitted, I can now decide Aetna's motion to dismiss.

---

[3] In Huntingdon Valley's sur-reply, it concedes that it is not basing its interference with prospective economic relations claim on the 2010 letters, but only on the allegedly threatening 2012 letters sent to the doctors. Huntingdon Valley's Sur-Reply 2.

## II.    Standard of Review

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint or, in this instance, a counterclaim.  *See United States v. Union Gas Co.*, 743 F. Supp. 1144, 1150 (E.D. Pa. 1990) ("The standard for dismissal of a counterclaim is the same as that for dismissal of a complaint.").  In analyzing a motion to dismiss, the court must "accept all of the [counterclaims'] well-pleaded facts as true, but may disregard any legal conclusions."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).  That means that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing *Bell Atlantic v. Twombly,* 550 U.S. 544, 555 (2007)).  The court must "then determine whether the facts alleged in the [counterclaims] are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).  This requirement of "facial plausibility" is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citation omitted).

## III.    Discussion

### A.    Counts I–V and ERISA Preemption

Aetna argues that Huntingdon Valley's Counts I–V (unjust enrichment and breach of contract) are preempted by § 514 of ERISA, which expressly preempts all state law claims that "relate to" an ERISA plan.[4]  Because this is an affirmative defense, Aetna bears the burden of

---

[4] In Counts I–V, this preemption defense applies only to Aetna's alleged underpayments for services that Huntingdon Valley provided to patients with ERISA-covered, fully-funded plans—not to its alleged underpayments for services that Huntingdon Valley provided to patients with ERISA-covered, self-funded plans.  That is because Count VIII (claim for ERISA benefits) is the only claim that Huntingdon Valley raises that comprises patients with ERISA-covered, self-funded plans.  *See* Countercl. ¶ 4 ("Except for the ERISA claims set forth as Count VII[I] herein, this Complaint does not raise any claims relating to the patients covered by these self-funded plans."); Huntingdon Valley's Resp. 2 ("For underpayments related to self-funded plans (plans for which Aetna typically fronts the money for claims and is promptly reimbursed by the plan), Huntingdon Valley asserted counterclaims under ERISA only.").

establishing it.  *Bank of La. v. Aetna U.S. Healthcare Inc.*, 468 F.3d 237, 242 (5th Cir. 2006)

(citations omitted).  At this time, these claims do not "relate to" ERISA plans.

Section 514 expressly preempts "any and all State laws insofar as they may now or

hereafter *relate to* any employee benefit plan [subject to ERISA]." 29 U.S.C. § 1144(a)

(emphasis added).  Under this provision, a State law "includes all laws, decisions, rules,

regulations, or other State action having the effect of law, of any State." *Id.* § 1144(b)(9)(c)(1).

State common law claims qualify as state laws under this definition and are thus targets for § 514

preemption.  *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 83 (3d Cir. 2012).

The "relate to" language of § 514 is "deliberately expansive" but not boundless.  *Pilot

Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 (1987); *N.Y. State Conference of Blue Cross & Blue

Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655–56 (1995).  In earlier cases, the Supreme

Court emphasized that Congress used the words "relate to" "in their broad sense, rejecting more

limited pre-emption language that would have made the clause 'applicable only to state laws

relating to the specific subjects covered by ERISA.'"  *Ingersoll-Rand Co. v. McClendon*, 498

U.S. 133, 138 (1990) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98 (1983)).  The Court,

however, later shifted away from the broadest possible reading of § 514(a) because, "[i]f 'relate

to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical

purposes pre-emption would never run its course, for '[r]eally, universally, relations stop

nowhere.'"  *Travelers*, 514 U.S. at 655 (citation omitted).

The Court has established that "[a] law 'relates to' an employee benefit plan . . . if it has

[1] a connection with or [2] reference to such a plan." *Shaw*, 463 U.S. at 96.  As to the second

alternative, a state law makes "reference to" an ERISA plan if on its face it "specifically refers"

to an ERISA plan. *Travelers*, 514 U.S. at 656 (quoting *District of Columbia v. Greater

*Washington Bd. of Trade*, 506 U.S. 125, 130 (1992)).  Here, Huntingdon Valley's claims derive

from state laws of general applicability that do not on their face specifically refer to an ERISA

plan.  Indeed, Pennsylvania state law claims of breach of contract and unjust enrichment

"function[] irrespective of [] the existence of an ERISA plan."  *Ingersoll*, 498 U.S. at 139.

More difficult is the question of whether these claims have a "connection with" an

ERISA plan.  Because "'connection with' is scarcely more restrictive than 'relate to,'" the Court

has "cautioned against an 'uncritical literalism' that would make pre-emption turn on 'infinite

connections.'"  *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001) (citation omitted).

To ascertain whether a state law has a connection with an ERISA plan, a court must therefore

"look . . . to the objectives of the ERISA statute as a guide to the scope of the state law that

Congress understood would survive."  *Travelers*, 514 U.S. at 656.

A principal objective of ERISA is "to establish a uniform administrative scheme, which

provides a set of standard procedures to guide processing of claims and disbursement of

benefits."  *Egelhoff*, 532 U.S. at 148 (citation omitted).  A state common law claim involving an

ERISA plan disrupts this uniform administrative scheme when it arises from an ERISA plan

itself or requires the court to interpret the terms of an ERISA plan, or both.  *Menkes v. Prudential

Ins. Co. of Am.*, 762 F.3d 285, 295–96 (3d Cir. 2014); *Temple Univ. Children's Med. Ctr. v. Grp.

Health, Inc.*, 413 F. Supp. 2d 530, 535–36 (E.D. Pa. 2006).

In *Menkes*, for example, the Third Circuit held that § 514 preempted state common law

claims because they would turn on how a court interpreted the plaintiffs' ERISA plans.  After

Prudential denied the plaintiffs benefits under their ERISA plans, they sued Prudential for fraud,

misrepresentation, and breach of contract, among other state claims.  762 F.3d at 288–89.

Because the plaintiffs predicated these claims on Prudential's allegedly "improper denial of

benefits," the Third Circuit stressed that it could resolve them only by interpreting what benefits Prudential owed the plaintiffs under their ERISA plans.  *Id.* at 295–96.  The Third Circuit also emphasized that the contracts the plaintiffs alleged that Prudential breached were the ERISA plans themselves.  *Id.* at 296.  It thus held that ERISA preempted these state claims because they would require the court to make "benefit determination[s] [that are] part and parcel of the ordinary fiduciary responsibilities connected to the administration of a plan."  *Id.*

For similar reasons, in *Temple University Children's Medical Center v. Group Health*, the court held that § 514 preempted Temple's breach of contract claim.  Temple was part of a Multiplan network that Group Health had a "right to access" for discounted rates on a "non-exclusive basis."  413 F. Supp. 2d at 532–33.  Under Group Health's agreement with Multiplan, if it chose to access these rates, it had to pay Temple 90% of the billed charges.  *Id.* at 535–36. After Temple operated on Rosenbaum, a Group Health member, it billed Group Health.[5]  *Id.* at 533.  Under Rosenbaum's ERISA plan itself, Group Health could pay Temple the "allowed charge," which was the "reasonable and customary charge."  *Id.*  Or, under its separate agreement with Multiplan, it could pay Temple 90% of the billed charges.  *Id.*  Group Health chose the "allowed charge" and paid Temple $20,000 on an $180,656 bill.  *Id.*  Temple sued Group Health for breach of contract, arguing it was bound to pay the Multiplan rate.  In finding that § 514 preempted this claim, the court emphasized that Group Health's "sole responsibility" for paying the bill arose from the plan itself—not from the Multiplan agreements that it chose not to access.  *Id.* at 536.  Moreover, to determine what Group Health owed for the services, it would have to reference and interpret the plan, not the Multiplan agreements.  *Id.*

---

[5] Temple sued based on billings for surgeries it performed on three Group Health members, but, in the interests of space and relevance, I describe only one member's situation.

Here, by contrast, Huntingdon Valley's Counts II and IV (breach of the Network Rental Agreement and the Access Agreement) neither arise from an ERISA plan nor require me to interpret one. It is true that under the Network Rental Agreement and the Access Agreement, Aetna had to pay Huntingdon Valley the discounted rates only for "Covered Services," which "means the health services covered pursuant to a Plan," and that deciding whether a service was "covered" requires interpreting a plan's benefits. But Huntingdon Valley has pleaded that there is no dispute over whether the billings at issue were for covered services. Indeed, it pleads that Aetna agreed the services at issue were covered under the plans and the dispute pertains only to the amount Aetna owes under the Network Rental Agreement and the Access Agreement. Countercl. ¶¶ 62, 86. In short, Huntingdon Valley has limited these claims to instances in which Aetna (1) agreed that the patients' services were covered under their plans, (2) chose to pay for those services under the Network Rental Agreement and the Access Agreement, and (3) failed to reimburse Huntingdon Valley at the rates required by these agreements. As a result, these breach of contract claims, unlike those in *Menkes* and *Group Health*, arise from Aetna's alleged breach of agreements that govern the rates paid outside of any ERISA plan—not from what services are covered under an ERISA plan. *See also Blue Cross of Cal. v. Anesthesia Care Assocs. Med. Grp., Inc.*, 187 F.3d 1045, 1053 (9th Cir. 1999) (holding § 514 did not preempt providers' claims because they arose from insurer's breach of the provider agreements' pay schedule and not from what was a "covered" service under an ERISA plan).

To be sure, I will at least have to consult the ERISA plans at some point in analyzing these claims. When Aetna chose to pay for a patient's service under the Network Rental Agreement and the Access Agreement, it had to pay 80% or 75% of Huntingdon Valley's charge master rate, respectively, less applicable co-payments, deductibles, and co-insurance. So to

decide if Aetna breached these agreements, I will have to learn this patient rate information set

out in the ERISA plans.  Huntingdon Valley's state law claims thus may implicate ERISA plans.

But the "mere fact that an employee benefit plan is implicated in the dispute . . . is not dispositive

of whether the breach-of-contract claims are preempted."  *Penny/Ohlmann/Nieman v. Miami*

*Valley Pension Corp.*, 399 F.3d 692, 699 (6th Cir. 2005); *see also Iola*, 700 F.3d at 85 (holding

that § 514 did not preempt state law claims because determining liability for the claims would

"require[] only a cursory examination of the plan provisions and turn[] largely on 'legal duties

generated outside the ERISA context'" (citation omitted)).  I therefore cannot find these claims

preempted at this stage.  Without more information about the specific plans and the extent of

their involvement in this dispute, if any, I do not know whether consulting them for this

information involves interpreting them in a way that disrupts plan administration or otherwise

contravenes ERISA's objectives.

   As of now, § 514 also does not preempt Huntingdon Valley's unjust enrichments claims

(Counts I, III, and V).[6]  Like its breach of contract claims, they neither arise from an ERISA plan

nor require me to interpret one.  In Pennsylvania, "when unjust enrichment is present, the law

implies the existence of a contract requiring the defendant to pay to the plaintiff the reasonable

value of the benefit conferred."  *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alts., Inc.*, 832

A.2d 501, 508 (Pa. Super. Ct. 2003).  In the context of payment for medical services,

Pennsylvania courts define "reasonable value" as the average charge that other insurance

companies have paid for the services at issue.  *Id.* at 510.  So if Huntingdon Valley establishes

these claims, I will find an implied contract in law that requires Aetna to pay it the reasonable

---

[6] In Count I, Huntingdon Valley claims unjust enrichment with respect to Aetna's alleged underpayments for all patients other than the Beech Street and Multiplan patients; in Counts III and V, Huntingdon Valley claims unjust enrichment with respect to Aetna's alleged underpayments for the Beech Street and Multiplan patients, respectively. Again, in each of these claims, Aetna's § 514 preemption defense applies only to Aetna's alleged underpayments for services that Huntingdon Valley provided to patients with ERISA-covered, fully-funded plans.  See *supra* note 3.

value of the services at issue, a value defined as the average charge that other insurance companies have paid it for similar services.  Huntingdon Valley's recovery will thus arise from this implied-in-law contract between Huntingdon Valley and Aetna, which is a contract separate and distinct from any patient's ERISA plan.  Moreover, I need not interpret an ERISA plan because this reasonable value is defined by the average charge and not by the terms of a specific ERISA plan, and because Aetna allegedly preapproved the services as "covered."

In sum, Huntingdon Valley's state common law claims at issue here elude § 514 preemption for now.  Based on the allegations in the counterclaims, they affect the "employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that [they] 'relate[] to' the plan[s]."  *Shaw*, 463 U.S. at 99 n.21.  But I might revisit this issue once Huntingdon Valley has articulated more details about the specific circumstances, billings, and ERISA plans underlying these state law claims.[7]

---

[7] Aetna bases its express preemption argument almost entirely on an unpublished District of New Jersey opinion.  I decline to follow that case, and if  I were to rely on any unpublished District of New Jersey opinion, it would be *Weisenberger v. BT Americas, Inc.*, Civ. No. 09-4828, 2010 WL 1133473 (D.N.J. Mar. 22, 2010).  There, the district court held that § 514 did not preempt a similar breach of contract claim because the claim did "not interfere with the administration or enforcement of any ERISA-covered plan."  *Id.* at *4.

### B.      Merits of Counts I–V: Breach of Contract and Unjust Enrichment[8]

### a.      Counts II and IV: Breach of Contract

In Counts II and IV, Huntingdon Valley claims that Aetna breached the Network Rental Agreement and the Access Agreement between Aetna and Beech Street/Multiplan, respectively. In these agreements, Aetna agreed to pay Huntingdon Valley the discounted rates that Beech Street/Multiplan had negotiated with Huntingdon Valley—rates that were memorialized in the separate agreements between Huntingdon Valley and Beech Street/Multiplan (the Beech Street Agreement and the Multiplan Agreement). Although Aetna and Beech Street/Multiplan are the only parties to the Network Rental Agreement and the Access Agreement, Huntingdon Valley contends that it has standing as a third party beneficiary to enforce these agreements against Aetna. Aetna argues that Huntingdon Valley is not a third party beneficiary to these agreements because the agreements expressly disclaim third party beneficiaries. At this early stage, though, the Network Rental Agreement and the Access Agreement are ambiguous on whether Huntingdon Valley is an intended third party beneficiary to them.

"Under Pennsylvania law, ambiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law." *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir. 1994) (citations omitted). A court

---

[8] In Aetna's leading argument on the merits of these claims, it contends that they should be dismissed because Huntingdon Valley's own allegations render them implausible. As Aetna reads Huntingdon Valley's counterclaims, Huntingdon Valley bases these claims on the allegation that Aetna should have paid 80% of its billed charges. But, according to Aetna, Huntingdon Valley alleges elsewhere in the counterclaims that Aetna was required to pay 80% of its billed charges *less* applicable patient payments. Because paying 80% of the billed charges is consistent with its alleged obligation to pay 80% of the billed charges less applicable patient payments, Aetna argues these claims are implausible. However, Huntingdon Valley's consistent position throughout the counterclaims is that Aetna was required to pay 80% of its billed charges less applicable patient payments, but it in fact paid about 45% of its billed charges less these payments. In paragraph 30, Huntingdon Valley does employ imprecise language that possibly contradicts this position, but, at this stage, I must resolve any differences in favor of Huntingdon Valley. *See Schrob v. Catterson*, 948 F.2d 1402, 1408 (3d Cir. 1991) ("In deciding a motion to dismiss, all well-pleaded allegations of the [counterclaims] must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them.").

therefore must first "determin[e] as a matter of law which category written contract terms fall

into—clear or ambiguous." *Id.* (citations omitted). "A contract is ambiguous if it is reasonably

susceptible of different constructions and capable of being understood in more than one sense."

*Id.* (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986)).

This analysis starts with the language of the contract. That is because, in Pennsylvania, a

court analyzing whether a contract is ambiguous first decides if it contains a patent ambiguity,

which is an ambiguity on the contract's face. *Id.* Further, in Pennsylvania, a court can recognize

a third party beneficiary if both parties to the contract express their intent to benefit the third

party in the contract itself. *Scarpitti v. Weborg*, 609 A.2d 147, 150–51 (Pa. 1992).[9]

Here, the Network Rental Agreement and the Access Agreement encompass language

that expresses the intent of Aetna and Beech Street/Multiplan to benefit providers like

Huntingdon Valley. Under the Network Rental Agreement, Aetna "agrees that, upon its receipt

from [Huntingdon Valley] of any claims for payment for the provision of Covered Services to

Members, [Aetna] will reprice the claims to reflect the Negotiated Rate" and "pay [Huntingdon

Valley] at the Negotiated Rate for Covered Services rendered to Members." Countercl. Ex. B, at

Aetna/HV 136468. In addition, under the Access Agreement, Aetna "shall forward all payments

to [Huntingdon Valley] within forty-five (45) days of the receipt from MULTIPLAN of the

properly repriced claim." Countercl. Ex. D, at Aetna/HV 167996. Given this language, Aetna

and Beech Street/Multiplan have expressed their intent to benefit Huntingdon Valley in these

agreements themselves. *See Temple Univ. Hosp., Inc. v. Grp. Health, Inc.*, 413 F. Supp. 2d 420,

---

[9] The Pennsylvania Supreme Court does permit an exception to this rule. If the parties have not expressed their
intent to benefit a third party in the contract itself, a court can recognize a third party beneficiary to a contract when:

> the circumstances are so compelling that recognition of the beneficiary's right is appropriate to
> effectuate the intention of the parties, and the performance satisfies an obligation of the promisee
> to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the
> beneficiary the benefit of the promised performance.

*Id.*

425 (E.D. Pa. 2005) ("It would be difficult to imagine a beneficiary to be 'more intended' than the third party a contracting party agrees to pay for services rendered."); *Vencor Hosps. v. Blue Cross Blue Shield of R.I.*, 169 F.3d 677, 680 (11th Cir. 1999) ("It would be hard to imagine a more direct benefit under a contract than the receipt of large sums of money.").

Both of these agreements, however, also contain express disclaimers of third party beneficiaries. In 2003, Aetna and Multiplan amended the Access Agreement and agreed to the following third-party-beneficiary disclaimer: "(e) No third party beneficiary. Nothing express or implied in this Amendment or in the Agreement is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assigns of the parties, any rights, remedies, obligations, or liabilities whatsoever." Countercl. Ex. D, at Aetna/HV 168058. In 2006, Aetna and Beech Street amended the Network Rental Agreement, agreeing to a similar disclaimer. Countercl. Ex. B., at Aetna/HV 136505.

A patent ambiguity thus emerges from this facially conflicting language, so the next question is whether it is susceptible to more than one reasonable interpretation. Because the disclaimers exclude all third party beneficiaries, one could reasonably conclude that Aetna and Beech Street/Multiplan intended for them to apply to Huntingdon Valley despite the language in the Network Rental Agreement and the Access Agreement expressing Aetna and Beech Street/Multiplan's intent to benefit Huntingdon Valley. Yet one could also reasonably conclude that Aetna and Beech/Multiplan did not intend for the disclaimers to apply to Huntingdon Valley. As discussed, in the Network Rental Agreement and the Access Agreement, Aetna and Beech Street/Multiplan expressed their intent to benefit providers like Huntingdon Valley. In addition, Aetna and Beech Street/Multiplan's intent to benefit Huntingdon Valley becomes even more apparent when considering not only the Network Rental Agreement and the Access

Agreement, but also the Beech Street Agreement and the Multiplan Agreement with Huntingdon Valley.  Read together, they show that Aetna and Beech/Multiplan may not have intended for the disclaimers to apply to Huntingdon Valley.

In Pennsylvania, a court can read several agreements together as a whole even if they were executed at different times and the parties to each agreement are different:

> Under Pennsylvania law, when two or more writings are executed at the same time and involve the same transaction, they should be construed as a whole. If the writings pertain to the same transaction, it does not matter that the parties to each writing are not the same.  This general rule also applies where several agreements are made as part of one transaction even though they are executed at different times.

*Id.* at 842 (internal citations omitted).

Here, the Network Rental Agreement and the Access Agreement between Aetna and Beech Street/Multiplan cannot be read in isolation from the Beech Street Agreement and the Multiplan Agreement between Huntingdon Valley and Beech Street/Multiplan.  Under the Network Rental Agreement, Aetna could access "rates . . . as negotiated between [Huntingdon Valley] and [Beech Street] for Covered Services."  Countercl. Ex. B, at Aetna/HV 136468.  Likewise, under the Access Agreement, Aetna had "access to discounted rates" that Multiplan had negotiated with Huntingdon Valley.  Countercl. Ex. D, at Aetna/HV 167995.  But Aetna could tap into these discounted rates only because Huntingdon Valley had agreed to accept them in the Beech Street Agreement and the Multiplan Agreement.  *See* Countercl. Exs. A, C.  In fact, Aetna's Access Agreement with Multiplan explicitly refers to the "Multiplan Contracts"— "those discounted contractual relationships that Multiplan has with Providers."  Countercl. Ex. D, at Aetna/HV 167995, 167996.  Moreover, for each transaction that occurred under all of these

16

agreements, Aetna paid Beech Street/Multiplan a fee that was small compared to what it paid Huntingdon Valley for its services.[10]

So these agreements, taken together, established a relationship among the parties in which the most significant exchange of benefits transpired between Aetna and Huntingdon Valley, with Beech Street and Multiplan merely collecting fees on each transaction. Indeed, by entering into the Network Rental Agreement and the Access Agreement, Aetna assumed not just the right to discounted rates for Huntingdon Valley's services, but the obligation to pay Huntingdon Valley under the Beech Street Agreement and the Multiplan Agreement. Given the relationship these agreements created between Aetna and Huntingdon Valley, Aetna and Beech Street/Multiplan may well not have intended for the disclaimers to apply to Huntingdon Valley.

Furthermore, in the Multiplan Agreement, Huntingdon Valley and Multiplan disclaim all third party beneficiaries—except for companies like Aetna:

> Third Party Beneficiaries. Nothing contained in this Agreement will be construed to make [Multiplan] or [Huntingdon Valley], and their respective directors, officers, employees, agents, and representatives liable to persons or entities not parties hereto in situations in which they would not otherwise be subject to liability, provided however, that [Multiplan] and [Huntingdon Valley] agree that [Aetna] is a third party beneficiary to this Agreement unless otherwise stated in the agreement between [Aetna] and [Multiplan].

Countercl. Ex. C, at HVSC0009625. Aetna therefore wants to have it both ways by arguing that the third-party-beneficiary disclaimers in the Network Rental Agreement and the Access Agreement apply to Huntingdon Valley. Under that argument, Aetna could enforce Huntingdon Valley's agreement with Multiplan to discount the rates for its services to Aetna members, but Huntingdon Valley could not enforce Aetna's agreement with Multiplan to pay it these rates.

---

[10] For example, in a 1996 amendment to the Acess agreement, Aetna agreed to pay Multiplan fifteen percent of the difference between what it would have paid without the benefit of the Multiplan contracts and what it paid with the benefit of the Multiplan contracts. Countercl. Ex. D, at Aetna/HV 168019.

In short, the Network Rental Agreement and the Access Agreement are somewhat ambiguous on whether Huntingdon Valley is an intended third party beneficiary to them. I thus cannot resolve the issue at this early stage and will deny Aetna's motion to dismiss these claims on the current state of the record.

### b.      Counts I, III & V: Unjust Enrichment

In Counts I, III, & V, Huntingdon Valley contends that Aetna was unjustly enriched by not paying it reasonable value for its services to Aetna members.[11] Aetna argues that Huntingdon Valley has failed to show that Aetna did not pay such value because it has not pleaded facts comparing the amounts it received from Aetna for its services with the amounts it received from other companies for similar services. According to Aetna, a plaintiff claiming unjust enrichment must detail these comparative amounts in its counterclaims to establish that a defendant paid less than reasonable value for its services. But the cases on which Aetna relies for this proposition do not support it, and so I reject its argument to dismiss these claims.

In the absence of an express contract, a party can recover damages under an unjust enrichment claim. To establish this claim, a party must show that (1) it conferred a benefit on the defendant; (2) the defendant appreciated such a benefit; and (3) the defendant accepted and retained the benefit "under such circumstances that it would be inequitable for defendant to

---

[11] In Count I, Huntingdon Valley claims unjust enrichment with respect to Aetna's alleged underpayments for all patients other than the Beech Street and Multiplan patients; in Counts III and V, Huntingdon Valley claims unjust enrichment with respect to Aetna's alleged underpayments for the Beech Street and Multiplan patients. Huntingdon Valley brings Counts III and V in the alternative to its claims of breach of the Network Rental Agreement and the Access Agreement (Counts II and IV). I note that Huntingdon Valley can pursue these unjust enrichment claims as an alternative to its breach of contract claims, but they must fail if it can recover under those contract claims. In Pennsylvania, if the relationship among the parties is founded on an express contract, a party cannot obtain relief via an unjust enrichment claim. *Benefit Trust Life Ins. Co. v. Union Nat'l Bank of Pittsburgh*, 776 F.2d 1174, 1177 (3d Cir. 1985). That is because "recovery is limited to the measure provided for in the contract." *United States v. Kensington Hosp.*, 760 F. Supp. 1120, 1135 (E.D. Pa. 1991). But Fed. Rule Civ. P. 8(d)(3) permits inconsistent claims at the pleading stage, and so "[c]ourts have permitted plaintiffs to pursue alternative theories of recovery based both on breach of contract and unjust enrichment, even when the existence of a contract would preclude recovery under unjust enrichment." *Id.* As of now, I have concluded only that Huntingdon Valley's breach of contract claims survive Aetna's motion to dismiss, so it is too early to preclude these unjust enrichment claims on the basis that an express, enforceable contract exists between Huntingdon Valley and Aetna.

retain the benefit without payment of value." *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. Ct. 2001).  And "when unjust enrichment is present, the law implies the existence of a contract requiring the defendant to pay to the plaintiff the reasonable value of the benefit conferred." *Temple Univ. Hosp.*, 832 A.2d at 508.  This remedy "restore[s] the status quo, *i.e.*, [the plaintiff] is placed in the position [it] would have been in if there had been no unjust enrichment." *Id.* (citation omitted).

To satisfy the elements of its unjust enrichment claims, then, Huntingdon Valley must at least show that Aetna did not pay it reasonable value for its services to Aetna members.  But according to Aetna, under Pennsylvania law, a plaintiff can show that the defendant did not pay reasonable value *only* by comparing the amounts it received from the defendant for its services with the amounts it received from other insurance companies for similar services.  Because Huntingdon Valley has not pleaded these amounts, Aetna argues that its claims are implausible. As support for the proposition that a plaintiff claiming unjust enrichment must set forth these comparative amounts to establish that a defendant paid less than reasonable value for its services, Aetna relies on *Temple University Hospital, Inc. v. Healthcare Management Alternatives, Inc.*, 832 A.2d 501 (Pa. Super. Ct. 2003), and *Eagle v. Snyder*, 604 A.2d 253 (Pa. Super. Ct. 1992).

These cases are inapposite.  Indeed, without even having such comparative amounts available to it, the Superior Court in *Temple* held that Temple had shown that the defendant, Healthcare, had not paid reasonable value for its services and thus "all of the elements of unjust enrichment were established."  832 A.2d at 507.  There, Healthcare operated a managed care program for Medicaid recipients.  *Id.* at 505.  As part of that program, it entered into a contract with Temple that required it to reimburse Temple at 115% of the Medicaid payment amount for services provided to Medicaid recipients.  *Id.*  After that contract expired, Temple continued to

service Medicaid recipients, but it now demanded that Healthcare reimburse it at its "published rates" (i.e., charge master rates). *Id.* Healthcare declined, settling on reimbursement rates of 100% of the Medicaid payment amounts or lower. *Id.* Temple claimed unjust enrichment, and the trial court agreed and awarded it damages amounting to the difference between what Healthcare had paid and Temple's published rates. *Id.*

On appeal, the Superior Court held that Temple had established the elements of unjust enrichment, but the trial court had awarded it excessive damages. It found that Temple had established the claim's elements because an expert had testified at trial that "Medicaid covered only eighty to eighty-three percent of the costs incurred by hospitals that treat indigent patients." *Id.* at 507. Because this testimony showed that Healthcare had paid "less than actual costs" for Temple's services, the Superior Court concluded that Healthcare "did not pay reasonable value for the services rendered," and so Temple had established its claim. *Id.* at 507–08. The Superior Court then considered the proper "remedy applicable" to Temple's successful claim, which was the reasonable value of Temple's services. Finding that the reasonable value of Temple's services was not its published rates because Temple rarely collected these rates, the Superior Court concluded that the trial court had awarded Temple a windfall rather than restored the status quo. *Id.* at 509. Instead, the Superior Court held that the reasonable value of Temple's services was the average charge that other insurance companies had paid Temple for the services at issue. *Id.* at 510. As a result, the Superior Court remanded the case to the trial court for a recalculation of damages for Temple's successful claim that was in accordance with this average charge. *Id.*

Aetna's reliance on *Temple* for its proposition is thus misplaced. If, as Aetna contends, a plaintiff claiming unjust enrichment must set forth these comparative amounts in its complaint (here, counterclaims) to establish that a defendant paid less than reasonable value for its services,

then the Superior Court in *Temple* never could have held that Temple had satisfied the claim's elements—it did not even know these comparative amounts.  Rather, the Superior Court held that Healthcare had not paid reasonable value because it had paid less than the actual cost of the services.

Aetna's reliance on *Eagle v. Snyder* is also misplaced.  There, the Superior Court held that the trial court had failed to give proper weight to the testimony of a doctor who testified about how to calculate the reasonableness of medical fees.  604 A.2d at 254–55.  It never held that a plaintiff claiming unjust enrichment can show that the defendant paid less than reasonable value only by comparing in its initial pleading payments it received from the defendant with payments it received from other companies for similar services.  In fact, it never even mentioned what type of claim was at issue; it referred only to "the claims of appellee physicians for fees for professional services."  *Id.* at 253.  And later Pennsylvania cases that cite *Eagle* (of which there are only four, including *Temple*) have done so mostly in the context of calculating damages after a plaintiff has established a defendant's liability for a state law claim.  *See, e.g.*, *Kashner v. Geisinger Clinic*, 638 A.2d 980, 983 n.6 (Pa. Super. Ct. 1994) (citing *Temple* in holding that a jury should have been allowed to consider the reasonable value of medical services in calculating damages after a plaintiff established a defendant's liability for medical malpractice).

For these reasons, I reject Aetna's argument for dismissing these claims.  To be sure, to establish these claims, Huntingdon Valley must prove at a later stage that Aetna paid less than reasonable value.  But neither *Temple* nor *Eagle* holds that Huntingdon Valley can do so only by comparing the amounts it received from Aetna with the amounts it received from other insurance companies for similar services in its counterclaims.  Of course, Huntingdon Valley can employ these comparative amounts at a later stage to prove that Aetna paid less than reasonable value for

its services.  Or, like Temple, it can prove by some other way that Aetna paid less than reasonable value.  But at this stage, the pleading stage, it has met its burden by alleging that it conferred a benefit on Aetna by providing discounted services to Aetna members; that Aetna enjoyed these benefits; and that Aetna failed to pay reasonable value for these benefits after agreeing to pay such value.

### C.    Count VIII and Exhaustion of Administrative Remedies

Under Count VIII, Huntingdon Valley brings a claim for ERISA benefits via § 502, which is ERISA's civil enforcement provision that allows a plan participant or beneficiary to "recover benefits due to [it] under the terms of [a] plan."  29 U.S.C. § 1132(a)(1)(B).[12]  Before asserting a § 502 claim in federal court, though, a plaintiff must exhaust its administrative remedies, a requirement that Aetna argues Huntingdon Valley has not met.  In response, Huntingdon Valley contends that it is excused from exhausting such remedies because it would be futile to do so.  But until now, Huntingdon Valley never even notified Aetna of its desire to recover these additional ERISA plan benefits that Aetna allegedly owes it.  Under Third Circuit law, this inaction means Huntingdon Valley cannot show futility.

"[A] federal court will not entertain an ERISA claim unless the plaintiff has exhausted the remedies available under the plan."  *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990).  But "[a] plaintiff is excused from exhausting administrative procedures under ERISA if it would be futile to do so."  *Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 249 (3d Cir. 2002).  That means, to bypass the exhaustion requirement, a plaintiff must "provide a clear and positive

---

[12] Although a § 502 action may be brought only "by a [plan] participant or beneficiary," § 1132(a)(1), "a health care provider has standing to assert claims assigned by a patient under Section 502(a) of ERISA."  *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 176 n.10 (3d Cir. 2014).  Huntingdon Valley thus has standing to sue via § 502 because—for this claim only—it is relying on its status as an assignee of ERISA benefits from Aetna members. Huntingdon Valley's Resp. 2.

showing of futility." *Id.* (citation omitted) (internal quotation mark omitted).  In deciding whether to excuse exhaustion on futility grounds, a court weighs the following factors:

> (1) whether plaintiff diligently pursued administrative relief; (2) whether plaintiff acted reasonably in seeking immediate judicial review under the circumstances; (3) existence of a fixed policy denying benefits; (4) failure of the insurance company to comply with its own internal administrative procedures; and (5) testimony of plan administrators that any administrative appeal was futile.

*Id.*  A court need not weigh all factors equally.  *Id.*

Huntingdon Valley does not draw upon these factors for its futility argument.  Instead, relying on cases not binding here, it argues that "[i]t would be futile for a counterclaim plaintiff, like Huntingdon Valley, to seek an administrative review where the administrator has already asserted a directly contrary position in a federal court lawsuit."  Huntingdon Valley's Resp. 11.

This argument fails because Huntingdon Valley concedes that it undertook no efforts before this lawsuit to present its claims for benefits to Aetna.  *See* Countercl. ¶ 130.  In the Third Circuit, a plaintiff seeking benefits via § 502 cannot overcome the exhaustion requirement if it has not even first notified the plan administrator of its desire for ERISA benefits.  *D'Amico v. CBS Corp.*, 297 F.3d 287, 293 (3d Cir. 2002) ("Our precedent makes clear . . . that Plaintiffs who fail to make known their desire for benefits to a [plan administrator] are precluded from seeking judicial relief.").  This requirement applies even if Aetna's "directly contrary position" in this lawsuit all but assured that it would deny Huntingdon Valley's claims.  In *Berger v. Edgewater Steel Co.*, for example, a plaintiff argued that it would have been futile for him to request the benefit at issue because the administrator had a policy of denying all such requests.  911 F.2d 911, 917 (3d Cir. 1990).  The Third Circuit agreed that this policy existed, but it still rejected the plaintiff's futility argument because "he never even asked for [the contested benefit]."  *Id.*; *see also Churchill v. Cigna Corp.*, No. 10-6911, 2011 WL 3563489, at *7 (E.D. Pa. Aug. 12, 2011)

("The Third Circuit has denied use of the futility exception . . . when an ERISA plaintiff did not request the contested benefit, even when the plan has a blanket policy of denying all such requests."). Given this law and Huntingdon Valley's prior inaction, I will dismiss this claim.[13]

### D. Counts VI and VII and the Statute of Limitations

In Counts VI and VII, Huntingdon Valley claims that Aetna interfered with its prospective economic relations with Aetna members and with Huntingdon Valley's physician partners who were also in-network Aetna physicians. It predicates these claims on letters that Aetna allegedly sent these physician partners threatening to cancel their provider agreements with Aetna if they did not stop referring patients to Huntingdon Valley. Aetna argues that these claims are time barred by their two-year statute of limitations. I reject this argument because Aetna has not shown that they are time barred on the face of Huntingdon Valley's counterclaims.

Aetna and Huntingdon Valley first disagree on when a claim "accrues" and starts the clock on the statute of limitations. Aetna argues that it accrues when the plaintiff discovers the allegedly interfering acts or could have discovered them with reasonable diligence. Relying on this proposition, it contends that these claims accrued when Aetna sent the threatening letters to the physician owners. Huntingdon Valley, on the other hand, asserts that these claims accrued not when the letters were sent but when Huntingdon Valley was injured from them.

Huntingdon Valley is correct. "A claim under Pennsylvania law accrues at the occurrence of the final significant event necessary to make the claim suable." *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 136 (3d Cir. 1998) (citation omitted) (internal quotation mark omitted). In Pennsylvania, a tortious interference claim includes as its final element "the occasioning of

---

[13] I also note that Aetna did not "assert[] a directly contrary position in a federal court lawsuit" until June 15, 2013, when it filed this suit. Yet Huntingdon Valley claims this somehow excused it from exhausting its administrative remedies on contested billings dating back to 2009, a period in which Aetna held no such "contrary position in a federal court lawsuit." So even if Huntingdon Valley's argument had any merit, which it does not as discussed above, it would apply only to contested billings that arose after Aetna sued and established its contrary position.

actual legal damage as a result of the defendant's conduct." *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 384 (3d Cir. 2004). "Thus a tortious interference claim does not accrue until, at least, the plaintiff suffers injury (i.e., 'actual legal damage') as a result of the defendant's conduct." *Id.* So here, Huntingdon Valley's claims accrued when the physician owners stopped referring patients to Huntingdon Valley as the result of Aetna's letters.

Aetna argues that Huntingdon Valley's claims are still barred even if they accrued at this point. As support, it attaches a few documents suggesting "that in 2010, a limited number of [Huntingdon Valley's] physician-partners decided to no longer refer Aetna members to [Huntingdon Valley], because they received [a] 2010 letter" from Aetna reminding them to refer their patients to in-network facilities and not to Huntingdon Valley. Aetna's Reply 6. According to Aetna, Huntingdon Valley's claims thus accrued in 2010 because these documents show that the physician owners were harmed by the letters in 2010, and so they are time barred. Huntingdon Valley, however, argues that its claims are not based on this 2010 letter, which it alleges was completely non-threatening, and "the actions a small group of doctors took in response to [it]." Huntingdon Valley's Sur-Reply 2. Rather, they are predicated on "the threatening letters Aetna sent to other Huntingdon Valley physician owners in or around 2012" and the actions these physician owners took in response to them. Under this timeframe, Huntingdon Valley argues that its claims accrued within the two-year statute of limitations.

Either way, these arguments and exhibits raise fact questions that are inappropriate for resolution on a motion to dismiss. *See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 425 (3d Cir. 1999) ("When the applicability of the statute of limitations is in dispute, there are usually factual questions as to when a plaintiff discovered or should have discovered the elements of its cause of action, and thus 'defendants bear a heavy burden in

seeking to establish as a matter of law that the challenged claims are barred.'" (citation omitted)). To succeed with this defense on a motion to dismiss, Aetna must show that the time alleged on the counterclaims' face establishes that the claims are barred. *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) ("If the [statute of limitations] bar is not apparent on the face of the [counterclaims], then it may not afford the basis for a dismissal of the [counterclaims] under Rule 12(b)(6)." (citation omitted)).  Yet Huntingdon Valley alleges only that Aetna "developed a plan" around 2010 to intimidate these physician partners and at some later time mailed "threatening letters" to them.  Countercl. ¶¶ 34–35.  It alleges nothing about when the physicians stopped referring patients to Huntingdon Valley because of these letters—that is, it alleges nothing about when Aetna's acts harmed the physicians.  It is thus unclear from the counterclaims' face whether Huntingdon Valley's claims are barred, so I cannot dismiss them on statute of limitations grounds.

An appropriate order follows.