# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AETNA LIFE INSURANCE COMPANY,<br>          Plaintiff,<br><br>                    v.<br><br>HUNTINGDON VALLEY SURGERY CENTER,<br>et al.,<br><br>                    Defendants. | CIVIL ACTION<br><br><br>No. 13-03101 |

## MEMORANDUM

YOHN, J.                                              September 15, 2015

In 2013, Aetna Life Insurance Company sued Huntingdon Valley Surgery Center,

Foundation Surgery Management, LLC (FSM), and Foundation Surgery Affiliates, LLC (FSA).

Huntingdon Valley is an ambulatory surgery center largely owned by twenty-two physicians.  It

is outside of Aetna's network—that is, it has no direct contract with Aetna to provide services to

Aetna members at reduced, negotiated prices.  The physician-owners, however, all have separate

provider agreements with Aetna governing their relationship with the insurer.  FSM—which is

wholly owned by FSA—manages Huntingdon Valley's day-to-day operations.  Aetna has

accused all three defendants of violating a Pennsylvania anti-kickback law, committing insurance

fraud, and tortiously interfering with Aetna's provider contracts with Huntingdon Valley's

physician-owners—all as part of a conspiracy to bilk it out of millions of dollars.

In August 2014, I denied the defendants' motion to dismiss on all claims except for unjust enrichment. Huntingdon Valley then fired back at Aetna, launching eight counterclaims, including breach of contract and unjust enrichment. In April 2015, I denied Aetna's motion to dismiss on all counterclaims except for Huntingdon Valley's counterclaim for ERISA benefits.

In June 2015, Huntingdon Valley, FSM, and FSA each moved for summary judgment on Aetna's remaining claims. Aetna cross moved on its insurance fraud claim (Count III) and also moved for summary judgment on Huntingdon Valley's counterclaims. Huntingdon Valley amicably settled with Aetna and is no longer a party, so its counterclaims are not at issue. Remaining as claims against FSM and FSA are Count I (violation of a Pennsylvania anti-kickback law); Count II (civil conspiracy); Count III (insurance fraud); Count IV (aiding and abetting insurance fraud); Count V (tortious interference with contract); Count VIII (equitable relief); and Count IX (equitable accounting).[1]

Based on the undisputed record, I will grant summary judgment to FSM and FSA on all counts but Count II (civil conspiracy) and Count V (tortious interference with contract). Before trial, though, the court must decide through an evidentiary hearing whether it has personal jurisdiction over FSA. Given the genuine issues of material fact surrounding this question, I cannot resolve it on a summary judgment motion.

---

[1] The Foundation defendants filed their motions and briefs separately and used repeated cross-references to their respective briefs. In addition, they incorporated by reference nearly all of Huntingdon Valley's memorandum of law. This confusing approach is discouraged by the court and appears to be an attempt to avoid the court's twenty-five-page limit on supporting briefs.

## I.   Background[2]

### A.   Aetna's Network

Aetna is a Connecticut corporation that provides health insurance and administrative services throughout the United States.  Aetna's Resp. FSM/FSA's Joint Statement Facts ¶ 19. To that end, it has created a network of medical providers by contracting with physicians and facilities across the country.  *Id.* ¶ 55.  Under these provider contracts, the "in-network" providers—physicians and facilities—administer services to Aetna members at reduced rates negotiated between themselves and Aetna.  *Id.* ¶¶ 55-56; Kleman Dep., Aetna Ex. 19, 21:24–22:21, Sept. 15, 2014.  When a provider cannot agree on rates with Aetna, though, the provider is "out-of-network" with Aetna.  Aetna's Resp. FSM/FSA's Joint Statement Facts ¶ 56.

Aetna members with out-of-network benefits usually pay much more money out-of-pocket when they are treated by providers outside of Aetna's network.  Kleman Dep., Aetna Ex. 19, 67:1–68:12.  Specifically, they tend to pay significantly higher co-payments, co-insurance, and deductibles.  *Id.*; Ottwell Dep., Aetna Ex. 10, 73:21–23, Nov. 6, 2014.

### B.   Huntingdon Valley Surgery Center and Its Physician-Owners

Huntingdon Valley is an ambulatory surgery center that is outside of Aetna's network. Aetna's Resp. FSM/FSA's Joint Statement Facts ¶¶ 1, 56.  Twenty-two physicians serve as limited partners in the facility, owning 80% of it, and also perform procedures there.  *Id.* ¶ 4.

These physician-owners all have provider contracts with Aetna even though Huntingdon Valley itself does not.  *Id.*  Each of them entered into his or her contract at a different time. Summary of Contracts, Aetna Ex. 22.  The contracts with Aetna are not identical as to their provisions, but they all provide a version of the following: "Provider shall render services to

---

[2] I draw this background from the undisputed facts, as well as from Aetna's evidence and all justifiable inferences deduced therefrom.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("[At summary judgment] [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor.").

Members only at those inpatient, extended care, and ancillary service *facilities* which have been *approved in advance* by [Aetna]." *E.g.*, Barmat Provider Contract, Huntingdon Valley Ex. 16, ¶ 1.3 (emphases added).

The physician-owners do not all enjoy equal interests in their combined 80% stake of Huntingdon Valley.  Partner List, Aetna Ex. 7.  Each month, the physician-owners receive cash distributions based on their respective ownership interests.  For example, in November 2013, physician-owners with a 4.16% interest (four shares) each earned a distribution of $3,992.38. November Distribution List, Aetna Ex. 16.  Moreover, that month, the physician-owners' interests ranged from 2.08% (two shares) to 5.19% (five shares).  *Id.*  The physician-owners can buy more shares in Huntingdon Valley if their productivity (i.e., use of the facility for their patients) warrants the increased equity.  Email, Aetna Ex. 11. But they can also be forced to sell their shares if their productivity falls short of expectations.  Emails, Aetna Exs. 12–15.

### C.   Foundation Management Affiliates, LLC and Foundation Surgery Affiliates, LLC

Since 2002, Huntingdon Valley has operated under a "Management Agreement" with FSM.  Aetna's Resp. FSM/FSA's Joint Statement Facts ¶ 6.  The agreement "vest[s] in [FSM] the authority for all 'day to day' management decisions, . . . [but Huntingdon Valley] retain[s] the right to make final policy decisions that [it] feels will impact the overall performance and/or the financial value of the Center."  Management Agreement, Aetna Ex. 1, § 2.1.  In exchange for its services, FSM collects 6% of Huntingdon Valley's "net monthly collected revenues."  *Id.* § 7.3.

FSM's responsibilities are wide and varied.  For example, it developed and modifies Huntingdon Valley's "Surgical Procedure Fee Schedule."  *Id.* § 5.5.  Known as a "chargemaster," this schedule comprises the routine charges for all procedures performed at

4

Huntingdon Valley during a calendar year.  Aetna's Resp. FSM/FSA's Joint Statement Facts ¶ 62.  FSM also identifies, recruits, and profiles potential physician-owners.  Management Agreement, Aetna Ex. 1, § 3.1.1.  In addition, it negotiates all provider contracts with insurers. *Id.* § 5.8.  Overseeing all of these responsibilities is a chief administrator, provided by FSM.  *Id.* § 5.1; Puglisi Dep., Aetna Ex. 5, 20:13–23, Oct. 7, 2014.  FSM, however, is not licensed to provide health care in Pennsylvania.  Aetna's Resp. FSM/FSA's Joint Statement Facts ¶ 49.

FSA wholly owns FSM.  FSM/FSA's Reply to Aetna's Resp.  Ex. A, ¶ 26.  It also wholly owns Foundation Surgery Holdings, LLC, which, as a limited partner, owns the remaining 20% of Huntingdon Valley. (The physician-owners own the other 80%.)  *Id.* ¶ 21, 24; Aetna's Resp. FSM/FSA's Joint Statement Facts ¶ 5.  Foundation Surgery Holdings, LLC also owns at least part of Foundation Surgery Affiliate General of Huntingdon Valley, LLC, which is the general partner of Huntingdon Valley.  FSM/FSA's Reply to Aetna's Resp. Ex. A, ¶ 25; Aetna's Resp. FSM/FSA's Joint Statement Facts ¶ 21.  Like FSM, FSA is not licensed to provide health care in Pennsylvania.  Aetna's Resp. FSM/FSA's Joint Statement Facts ¶ 37.

### D.   Huntingdon Valley's Waiver and Billing Practices

As part of a practice implemented by FSM, Huntingdon Valley waived most of the high out-of-pocket payments for Aetna members during the relevant time period in this case.  Patient Financial Policy, Aetna Ex. 30; Mannherz Dep., Aetna Ex. 4, 175:3–10, June 27, 2014.  Indeed, FSM made "every attempt" to limit Aetna members' out-of-pocket costs to what they would have paid out-of-pocket at an in-network facility.  Patient Financial Policy, Aetna Ex. 30.[3]

Although it waived these member payments, FSM sent bills to Aetna for the full chargemaster prices.  Aetna's Resp. FSM/FSA's Joint Statement Facts ¶ 62, 64; Mannherz Dep.,

---

[3] Aetna has submitted evidence that FSM controlled Huntingdon Valley's billing process, which I must accept for purposes of this summary judgment motion.

Aetna Ex. 4, 86:4-17.  Again, these prices were the routine charges set by FSM for all procedures performed at Huntingdon Valley.  For any given procedure, FSM sent bills for the same price from this list—regardless of the insurer being billed.  Aetna's Resp. FSM/FSA's Joint Statement Facts ¶ 64

### E.    The Beech Street and MultiPlan Networks

For most if not all of Huntingdon Valley's bills to Aetna at issue in this case, Aetna paid Huntingdon Valley through the so-called "rental networks" of Beech Street and MultiPlan. Kleman Dep., Aetna Ex. 19, 17:2–18:21; Aetna's Reply 5.  Beech Street and MultiPlan were companies that created their own networks composed of providers like Huntingdon Valley that agreed to accept discounted rates for their services.  HVSC's MultiPlan/Beech Street Contracts, Aetna Exs. 36–37.  In exchange for access to these networks, Aetna paid Beech Street and MultiPlan a fee for every transaction.  Aetna's  MultiPlan/Beech Street Contracts, Exs. 34–35.

This arrangement was created by two agreements.  First, Beech Street and MultiPlan entered into agreements with Huntingdon Valley memorializing the discounted rates at which Huntingdon Valley was willing to be reimbursed by insurers like Aetna.  HVSC's MultiPlan/Beech Street Contracts, Aetna Exs. 36–37.  For Beech Street, Huntingdon Valley agreed to "be reimbursed 80% of usual billed charges, less applicable Copayments, Deductibles and Coinsurance."  HVSC's Beech Street Contract, Aetna Ex. 37.   For MultiPlan, it agreed to be reimbursed "75% of Facility's Billed Charges, less any Co-payment, Deductible, and/or Co-insurance."  HVSC's Multiplan Contract, Aetna Ex. 36.  Second, Aetna entered into agreements with Beech Street and MultiPlan giving it access to these networks for a fee.  Aetna's MultiPlan/Beech Street Contracts, Exs. 34–35.

## II.     Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Material facts are those that could affect the outcome of the proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party."  *Roth v. Norfalco, LLC*, 651 F.3d 367, 373 (3d Cir. 2011) (citations omitted) (internal quotation marks omitted).  To establish the existence or absence of a genuine dispute as to any material fact, a party must "cit[e] to particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  "Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof."  *Singletary v. Pennsylvania Dep't of Corr.*, 266 F.3d 186, 192 n.1 (3d. Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

"In evaluating the motion, 'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'"  *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 772 (3d Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted) (internal quotation marks omitted).

## III.    Discussion

### A.    Violation of Anti-Kickback Law

In Count I, Aetna claims that FSM and FSA violated 18 Pa. Cons. Stat. Ann. § 4117(b)(2).  Broadly speaking, under this provision, a "health care provider," which is an undefined term, cannot pay kickbacks for referrals in cases involving health insurance claims. Aetna alleges that FSM and FSA violated this provision by allowing the physician-owners to increase their individual equity stakes in Huntingdon Valley based on the volume of Aetna members they treated at Huntingdon Valley, and also by waiving the Aetna members' high out-of-pocket costs to induce them to treat at Huntingdon Valley.  In response, FSM and FSA argue that they are not "health care provider[s]."  They assert that the Pennsylvania General Assembly intended for section 4117(b)(2) to apply only to licensed health care providers, and that it is undisputed that neither of them holds any such license.  I agree.

To decide whether a "health care provider" under the statute includes entities not licensed to provide health care in Pennsylvania, I must apply certain canons of statutory construction. Under Pennsylvania's Statutory Construction Act of 1972, "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly."  1 Pa. Cons. Stat. Ann. § 1921(a).  To that end, "[e]very statute shall be construed, if possible, to give effect to all its provisions," and a court "should not interpret statutory words in isolation, but must read them with reference to the context in which they appear."  *Id.*; *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1283 (Pa. 2014).  "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."  1 Pa. Cons. Stat. Ann. § 1921(b).  But when a provision is susceptible of differing interpretations, a court must apply other canons of construction and look beyond the statute's

text to glean the legislature's intent.  *Pennsylvania Fin. Responsibility Assigned Claims Plan v. English*, 664 A.2d 84, 87 (Pa. 1995).

I start with the text of section 4117(b)(2).  *See Whalen v. Dep't of Transp. Bureau of Driver Licensing*, 32 A.3d 677, 679 (Pa. 2011) ("In general, the best indication of legislative intent is the plain text of the statute.").  FSM and FSA argue that "the express terms of section 4117(b)(2) unambiguously establish[] that the General Assembly intended the anti-kickback provisions to control only the conduct of practitioners who are licensed by the Commonwealth to provide health care services."  FSM's Mot. Summ. J. 8.

Part of the "Insurance Fraud" statute in the Crimes Code, section 4117(b)(2) consists of two sentences.[4]  The first describes the prohibited conduct and states to whom it applies:

> With respect to an insurance benefit or claim covered by this section, *a health care provider* may not compensate or give anything of value to a person to recommend or secure the provider's service to or employment by a patient or as a reward for having made a recommendation resulting in the provider's service to or employment by a patient . . . .

18 Pa. Cons. Stat. Ann. § 4117(b)(2) (emphasis added).  The statute does not define health care provider.  Next, if a health care provider is convicted of engaging in this conduct, the second sentence mandates a suspension of the provider's license: "Upon a conviction of an offense provided for by this paragraph, the prosecutor *shall certify such conviction to the appropriate licensing board* in the Department of State which *shall suspend or revoke the health care provider's license*."  *Id.* (emphases added).

Given this plain text, FSM and FSA's argument is strong.  In the first sentence, the General Assembly broadly refers to a "health care provider."  But the second sentence can reasonably be interpreted as limiting such a provider to a licensed one by requiring that, upon a

---

[4] This statute provides a civil cause of action for insurers.  18 Pa. Cons. Stat. Ann. § 4117(g).

conviction, the prosecutor "shall certify such conviction to the appropriate licensing board in the Department of State," which "shall suspend or revoke the health care provider's license." *See O'Rourke*, 778 A.2d at 1201 ("[T]o ascertain and effectuate the intent of the Legislature . . . . we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear."). The second sentence does not read: "the prosecutor shall certify such conviction to the appropriate licensing board, *if any*, which shall suspend or revoke the health care provider's license, *if any*." Moreover, interpreting section 4117(b)(2) otherwise would render the second sentence superfluous in the event a prosecutor won a criminal conviction against an unlicensed entity. 1 Pa. Cons. Stat. Ann. § 1921 ("Every statute shall be construed, if possible, to give effect to all its provisions."); *Fisher v. Dep't of Public Welfare*, 501 A.2d 617, 619 (Pa. 1985) ("The supreme principle of statutory interpretation must be that each word used by the Legislature has meaning and was used for a reason, not as mere surplusage. The Legislature cannot be deemed to intend that its language be superfluous and without import.").

In response, Aetna offers somewhat tenuous arguments. It points out that section 4117(b)(2)'s second sentence refers only to a "conviction," which is an impossible situation here, which only involves civil claims. It also argues that regardless of whether FSM and FSA are licensed health care providers, they are "in fact" providing health care. Aetna thus seems to claim implicitly that the General Assembly intended to distinguish between what qualifies as a health care provider in a criminal case and what qualifies as one in a civil case. It seems to argue that only licensed health care providers can be criminally liable, but licensed health care providers *and* unlicensed entities that are "in fact" providing health care can be civilly liable. Besides this strained textual reading of section 4117(b)(2), Aetna has not highlighted anything in

the statute's text to support such a distinction. Nor has it cited any case law to bolster this argument.

Even if I were to assume for the purpose of argument that the statute is ambiguous on whether an unlicensed entity can be a health care provider, I would then look elsewhere to glean legislative intent. Both FSM/FSA and Aetna urge me to construe section 4117(b)(2) as in pari materia with other statutes that explicitly define "health care provider." "Statutes or parts of statutes are in pari materia when they relate to the same persons or things or to the same class of persons or things." 1 Pa. Cons. Stat. Ann. § 1932. "Laws in pari materia shall be construed together, if possible, as one law." *Whiteman v. Degnan Chevrolet, Inc.*, 272 A.2d 244, 247 (Pa. Super. Ct. 1970) (citation omitted).

In a different context, the Pennsylvania Supreme Court recently construed one statute as in pari materia with another to define "health care provider." In *Landay v. Rite Aid of Pennsylvania*, the court considered whether pharmacies were "health care provider[s]" under the Medical Records Act (MRA). 104 A.3d 1272, 1273 (Pa. 2014). In 1998, the General Assembly had amended the MRA by capping the amount a "health care provider" can charge for reproducing medical records, but it left "health care provider" undefined. *Id.* at 1274–75, 1283. To glean the General Assembly's intent on the term's meaning, the court examined how other statutes defined it in 1998. *Id.* at 1283. Some defined the term explicitly to include pharmacies; some did not. *Id.* The Health Care Facilities Act (HCFA) did not explicitly include pharmacies, defining the term broadly as a person or entity "that operates a health care facility." *Id.* The court then concluded that both the HCFA and the MRA relate to "cost containment in the area of health care," unlike the other statutes it examined that explicitly include pharmacies in their definition of health care provider. *Id.* at 1284-85. Consequently, it construed the MRA as in pari

11

materia with the HCFA and held that pharmacies are not health care providers under the MRA because they do not "operate[]" a health care facility. *Id.* at 1285. Therefore, here, in section 4117(b)(2) where "health care provider" is also undefined, I can construe the statute as in pari materia with another statute to define the term.

Aetna proffers the HCFA's broad "operates" definition. It claims, though, not that the HCFA relates to health care cost control, but that it relates to "responsible management and operation of health care facilities." Aetna's Resp. FSM/FSA Mots. Summ. J. 7. Casting the statute's purpose in this light, Aetna surmises that it is much more similar to the Pennsylvania "Insurance Fraud" statute than any statutes cited by FSM and FSA. According to Aetna, then, a health care provider under section 4117(b)(2) is a person or entity "that operates a health care facility," raising a jury question as to whether FSM and FSA are in fact operating one.

FSM and FSA, on the other hand, flag the "Insurance Fraud" section of the Worker's Compensation Act, 77 Pa. Cons. Stat. Ann. § 1039. They point out that, like section 4117, it governs insurance fraud violations. And it defines a health care provider as "a person licensed or certified pursuant to law to perform health care activities." 77 Pa. Cons. Stat. Ann. § 1039.1.

Curiously, though, they fail to highlight that this section has an anti-kickback provision—section 1039.3—that is almost identical to section 4117(b)(2). In fact, the only textual difference between them is that section 4117(b)(2) applies "to an insurance benefit or claim covered by this section" and section 1039.3 applies "to a workers' compensation insurance benefit or claim":

| Section 4117(b)(2) | Section 1039.3 |
|---|---|
| With respect *to an insurance benefit or claim covered by this section*, a health care provider may not compensate or give anything of value to a person to recommend or secure the provider's service to or employment by a patient or as a reward for having made a recommendation resulting in the provider's service to or employment be a patient; except that the provider | With respect *to a workers' compensation insurance benefit or claim*, a health care provider may not compensate or give anything of value to a person to recommend or secure the provider's service to or employment by a patient or as a reward for having made a recommendation resulting in the provider's service to or employment by a patient, except that the provider may pay the reasonable cost of |

12

| | |
|---|---|
| may pay the reasonable cost of advertising or written communication as permitted by rules of professional conduct. Upon a conviction of an offense provided for by this paragraph, the prosecutor shall certify such conviction to the appropriate licensing board in the Department of State which shall suspend or revoke the health provider's license. | advertising or written communication as permitted by rules of professional conduct. Upon a conviction of an offense under this subsection, the prosecutor shall certify the conviction to the appropriate licensing board in the Department of State which shall suspend or revoke the health care provider's license. |

I will therefore construe section 4117(b)(2) as in pari materia with section 1039.3. Both provisions combat the exact same evil: "health care provider[s']" paying kickbacks for referrals in cases involving insurance claims. They are worded almost identically. They also both constitute first-degree misdemeanors if violated. 18 Pa. Cons. Stat. Ann. § 4117(b)(2); 77 Pa. Cons. Stat. Ann. § 1039.5.[5] Given these parallels, the General Assembly likely intended for the term to be defined the same in both of them.[6]

To be sure, the General Assembly enacted section 1039.3 three years after it enacted section 4117(b)(2). As articulated by the Supreme Court, however, "[t]he rule of in pari materia . . . is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context." *Erienbaugh v. United States*, 409 U.S. 239, 243 (1972). As a result, "[a] later act can . . . be regarded as a legislative interpretation of (an) earlier act . . . in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting, and is therefore entitled to great weight in resolving any ambiguities and doubts." *Id.* at 244 (citation omitted) (quotation marks omitted).

---

[5] Aetna calls the Worker's Compensation Act an "inapposite, non-criminal statute." Aetna's Resp. 6. It claims that the statute combats neither crime nor insurance fraud. While much of the Act is non-criminal, these statements are belied by the text of section 1039.5 ("Punishment for offenses"), a provision in the Act's "Insurance Fraud" section.

[6] Aetna also argues that defining "health care provider" in section 4117(b)(2) as a licensed entity would "create an absurd result." Aetna's Resp. FSM/FSA Mots. Summ. J. 9. It claims that this limited definition would mean that "any person or entity could operate a medical facility illegally in Pennsylvania by failing to procure a license, yet be immune from liability for insurance fraud and illegal kickbacks simply by operating without a license." *Id.* But given section 4117(b)(2)'s similarities to section 1039.3—a provision that sanctions the same "absurd result"—this argument is unpersuasive.

Aetna has also argued that, if the term is ambiguous, the court "should construe § 4117(b)(2) broadly and with an eye toward protecting the significant public interests at stake." Aetna's Resp. FSM/FSA Mots. Summ. J. 6.  It cites 18 Pa. Cons. Stat. Ann. § 105, which states that ambiguous language in the Crimes Code "shall be interpreted to further the general purposes stated in this title and the special purposes of the particular provision involved."  Nevertheless, the General Assembly, accordant with the rule of lenity, has also admonished courts to "strictly constru[e]" penal provisions.  1 Pa. Cons. Stat. Ann. § 1928.  As a penal provision that also provides a civil cause of action, section 4119(b)(2) is subject to this rule, and so any ambiguities should be interpreted strictly and consistently in both the criminal and the civil context.  *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies."); *Brown v. Bureau of Prof'l & Occupational Affairs*, 18 A.3d 1256, 1259 (Pa. Commw. Ct. 2011) ("Consistent with the rule of lenity . . . 1 Pa.C.S. § 1928 requires that every penal provision, whether in a civil or criminal statute, be construed strictly.").

I will therefore grant summary judgment to FSM and FSA on Count I, as it is undisputed that neither is licensed to provide health care in Pennsylvania and is not a health care provider under the terms of the statute.[7]

---

[7] This conclusion is also supported by the common definition of "health care provider."  "Health care provider" is ordinarily and usually defined as a person who provides services to a patient for the purpose of preventing or treating an illness or disability.  *See, e.g.*, *McGraw-Hill Concise Dictionary of Modern Medicine* (2002), *available at* http://medical-dictionary.thefreedictionary.com/provider (defining "provider" as "person–eg, doctor, nurse, nurse practitioner, or institution–eg, hospital, clinic, or lab, that provides medical care.").

Aetna cannot overcome this conclusion with the additional evidence that it asked to file long after the close of discovery and the filing of its response and sur-reply to FSA's and FSM's motions for summary judgment.  On August 12, 2015, it filed a motion asking the court to consider a press release issued on August 11, 2015, by Foundation Healthcare, Inc., the supposed parent company of FSA and FSM.  I will consider this evidence, but it is of no help to Aetna.  In this press release, Foundation Healthcare, Inc.  reported its second quarter results but also stated that "[p]atient care is our number one priority" and that "our clinical teams continue to perform at a high level which is why we believe our patient satisfaction scores are some of the highest in the country."  Aetna claims that this press release is evidence that FSA and FSM are health care providers under section 4117(b)(2).  This press

## B.      Insurance Fraud

In Count III, Aetna claims that FSM committed insurance fraud.[8]  According to Aetna,

FSM routinely and secretly waived the out-of-pocket payment obligations of Aetna members to

entice them to treat at Huntingdon Valley.[9]  When billing Aetna, though, FSM did not discount

the billed charges to reflect the members' waived out-of-pocket payments, allegedly causing

Aetna to pay more than it should have.  FSM and Aetna have cross moved for summary judgment

on this claim.  Based on the undisputed record, I conclude that FSM did not knowingly

misrepresent Huntingdon Valley's billed charges with this waiver and billing practice.[10]

Aetna claims that FSM's actions violated section 4117(a)(2), which provides:

> [An entity commits insurance fraud when it] [k]nowingly and with the intent to
> defraud any insurer or self-insured, presents or causes to be presented to any
> insurer or self-insured any statement forming a part of, or in support of, a claim
> that contains any false, incomplete or misleading information concerning any fact
> or thing material to the claim.

18 Pa. Cons. Stat. Ann. § 4117(a)(2).  To prove an entity submitted false statements knowingly,

"[i]t is sufficient to show that [the statements] were false in fact and that [the entity] knew they

were false when [it] made them since an answer known by [the entity] to be false when made is

presumptively fraudulent."  *Evans v. Penn Mut. Life Ins. Co.*, 186 A. 133, 138 (Pa. 1936).

---

release, however, was not issued by FSA or FSM and lacks any reference to them or Huntingdon Valley.  Indeed, it focuses not on ambulatory surgery centers like Huntingdon Valley but on Foundation Healthcare, Inc.'s "majority owned" hospitals and the increased revenue at those facilities.  Huntingdon Valley is not one of those facilities.

[8] Aetna brings this claim against Huntingdon Valley and FSM, but not FSA.  Though Huntingdon Valley is no longer part of the case, I will refer to it and FSM's alleged billing practices in this section.  Aetna has presented evidence that FSM controlled Huntingdon Valley's billing process not only by submitting the billed charges to insurers but also by establishing the fee schedule or chargemaster that was used in the center's day-to-day billing.  *See* Mannherz Dep., Aeta Ex. 4, 86:4–17; Management Agreement, Aetna Ex. 1, § 5.5.

[9] According to Aetna's briefing, the defendants have abandoned the policy of waiving Aetna members' payments, and the physician-owners of Huntingdon Valley have agreed not to refer Aetna patients to an out-of-network facility any longer.

[10] Aetna also argues that FSM committed insurance fraud by inflating its billed charges with amounts of money that it was paying to the physician-owners as kickbacks for referring patients to Huntingdon Valley.  Aetna, however, can no longer claim that the billed charges were inflated because of illegal kickbacks under section 4117(b)(2).  As discussed, FSM and FSA are not health care providers under section 4117(b)(2) because they are not licensed, and Huntingdon Valley—an admitted licensed health care provider—is no longer a party in this case.

Aetna has focused on Huntingdon Valley's billed charges that Aetna chose to pay via the Beech Street and MultiPlan agreements.[11]  When Aetna chose to access these agreements to pay for Huntingdon Valley's out-of-network services to its members, it was supposed to reimburse Huntingdon Valley at either 80% (Beech Street) or 75% (MultiPlan) of the "usual billed charges" or "Billed Charges," "less applicable Copayments, Deductibles and Coinsurance."  Huntingdon Valley's contract with Beech Street does not explicitly define "usual billed charges," but written on the contract next to this term is "HVSC billed charges & fee schedule."  HVSC's Beech Street Contract, Aetna Ex. 37.  Its contract with MultiPlan explicitly defines "Billed Charges" as "the fees for a specified health care service or treatment routinely charged by [Huntingdon Valley] regardless of payment source."  HVSC's MultiPlan Contract, Aetna Ex. 36.

In other words, FSM would first submit Huntingdon Valley's "usual billed charges" or "Billed Charges" for the procedure.  Aetna would then multiply that amount by either 80% (Beech Street) or 75% (MultiPlan).  This number was the "allowed amount," which was the maximum amount that Aetna would pay for the service.  *See* Summ. Ex. of Patient Discount Spreadsheet, Aetna Ex. 31.  Next, from this allowed amount, Aetna would deduct the member's payment responsibilities of co-pays, co-insurance, and deductibles.  *Id.*  This final number was the "paid amount," meaning the amount that Aetna actually paid in the end.  *Id.*[12]

Aetna's dispute with this process is that FSM would waive most if not all of the member's payment obligations to draw the member to Huntingdon Valley.  To borrow and slightly modify one of Aetna's examples, say an Aetna member was treated at Huntingdon

---

[11] Aetna asserts that it "reimbursed Defendants for the overwhelming majority of the claims at issue" under either the Beech Street agreement or the MultiPlan agreement.  Aetna's Reply 5.

[12] The claim forms used by the defendants, the standard UB-04s used throughout the health care industry, did not require or even allow Huntingdon Valley to disclose the amount a patient was expected to or did pay.  The UB-04 form required the defendants to submit "total" amounts billed without reference to patient payments.

Valley and Aetna received a billed charge of $10,000.  Assume that Aetna pays for this service via the Beech Street agreement and that this member has a co-insurance obligation of 50%.

| Billed Charge | Allowed Amount | Co-Insurance | Paid Amount |
|---|---|---|---|
| $10,000.00 | $8,000.00 (80% of billed charge) | $4,000.00 (50% of allowed amount) | $4,000.00 (50% of allowed amount) |

The member, however, would never pay most or all of his or her $4,000 obligation because FSM would waive it and not tell Aetna.  If FSM had not waived it, the member probably would have had the procedure performed at an in-network facility where his or her payment obligation would have been much lower.  *See* Memo, Aetna Ex. 33 (stating that, in light of a change in the policy of waiving patient payments, "[i]t is probably in [the members'] best interest to have their procedure performed at an in network facility").  This practice cost Aetna money: if the member's procedure had been performed at an in-network facility, Aetna contends it likely would have paid based on a much lower "allowed amount" as part of its provider contract with that facility.

Aetna argues that this practice "violates the plain, express language of § 4117(a)(2)." Aetna's Resp. FSM/FSA Mots. Summ. J. 32.  Yet it has cited not one case holding that this practice violates section 4117(a)(2), let alone any case that is binding here.  *See* Aetna's Mot. Part. Summ. J. 7 ("[N]o court has yet had occasion to interpret § 4117(a)(2) in these circumstances . . . .").[13]  Nor has it flagged any Pennsylvania statute outlawing this practice.[14]

---

[13] Aetna relies on a 1994 "OIG Special Fraud Alert" of the Department of Health and Human Services on Medicare fraud; an informal opinion from the South Carolina Attorney General's Office; an informal opinion from New York's Department of Financial Services; and sparse, inapposite cases from outside this state, district, and circuit.

[14] None seems to exist.  While several states outlaw this type of practice, Pennsylvania apparently is not one of them.  In Nevada, for example, "[a] medical facility shall not waive a deductible or copayment if: 1. The medical facility is not a preferred provider of health care; and 2. The waiver would reduce the financial effect of a preferred provider's incentives or disincentives to its insured."  Nev. Rev. Stat. § 449.195.

In any event, FSM argues that this practice is not fraudulent under the statute because what Aetna paid was not impacted by whether it ever collected the member's payment.  As support, it cites (and somewhat misstates) the deposition testimony of Robert Kleman, an Aetna executive.  What Kleman actually testified was that, based on his belief, Aetna's final "paid amount" for the member's procedure assumed that the member was paying his or her portion of the allowed amount.  Kleman Dep., Huntingdon Valley Ex. 52, 114:3-117:12, Sept. 15, 2014.

FSM's argument is better illustrated by the example.  There, Aetna set the allowed amount at $8,000 by multiplying the $10,000 billed charge by 80%.  Of that $8,000, $4,000 or 50% fell to the patient as co-insurance, and Aetna paid the other $4,000 or 50%.  So regardless of whether the member ever pays the $4,000, Aetna is obligated to pay its $4,000.  Put differently, by waiving the member's portion, FSM has not affected what Aetna actually pays.

Not so, responds Aetna.  It argues that FSM has misrepresented the "actual" charge and caused it to overpay, relying largely on a 1994 "OIG Special Fraud Alert" of the Department of Health and Human Services concerning Medicare.  That alert described a possible example of Medicare fraud:

> A provider, practitioner, or supplier who routinely waives Medicare copayments or deductibles is misstating its actual charge. For example, if a supplier claims that its charge for a piece of equipment is $100, but routinely waives the copayment, the actual charge is $80. Medicare should be paying 80 percent of $80 (or $64), rather than 80 percent of $100 (or $80). As a result of the supplier's misrepresentation, the Medicare program is paying $16 more than it should for this item.

Dep't of Health & Human Servs., *OIG Special Fraud Alert* (Dec. 19, 1994), *available at* http://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html.

Aetna claims that FSM was running this "exact scheme that the federal government long ago deemed to constitute fraudulent billing and false claims."  Aetna's Reply 5.  According to

Aetna, if FSM is going to waive the member's $4,000 payment, the billed charge should be $6,000, not $10,000, because "the actual level of billed charges was already discounted to the patient before Aetna received a bill." *Id.* Aetna never says what final amount it should have paid, but I assume that it believes that it should have paid $2,400 (80% of $6,000 is $4,800, less the 50% portion of the member's coinsurance).

Aetna is comparing apples to oranges. In the Medicare example, the supplier is representing to the insurer that the $100 billed charge is its "actual charge," which is the total amount that it intends to collect between the insurer and the beneficiary. The insurer thus assumes that the supplier is going to collect the beneficiary's $20 or 20% co-payment, and relies on the $100 actual charge to calculate its $80 or 80% obligation. In effect, the supplier—not the insurer—is setting the "allowed amount," and representing that it intends to collect the beneficiary's portion of this amount. So when it routinely waives the $20 co-payment, it has indeed misrepresented the $100 actual charge or total amount that it intends to collect between the insurer and the beneficiary, causing the insurer to overpay. If the insurer had known that the supplier actually intended to collect only $80, it would have paid 80% of $80 ($64).

By contrast, FSM is not representing that the $10,000 "usual billed charge[]" or "Billed Charge[]" is the actual charge or total amount that it intends to collect between Aetna and the member. Rather, it is undisputed that FSM uniformly lifted these charges from Huntingdon Valley's chargemaster list. Aetna's Resp. FSM/FSA Joint Statement Facts ¶ 64. This was the price list that comprised the routine rates for all the procedures performed there. *Id.* ¶ 62. These rates are not "actual charges" that providers intend to collect in full from insurers and members; they are (usually) the inflated "sticker prices" for providers' services that the insurer itself then trims to set the allowed amount. *See* George A. Nation III, *Determining the Fair and*

19

*Reasonable Value of Medical Services: The Affordable Care Act, Government Insurers, Private Insurers and Uninsured Patients*, 65 Baylor L. Rev. 425, 429 (2013) ("Another important characteristic of healthcare is that chargemaster or list prices are not fair and reasonable. They are grossly inflated because they are set to be discounted rather than paid."); Peter R. Kongstvedt, *Health Insurance and Managed Care: What They Are and How They Work* 134 (4th ed. 2016) ("Chargemaster charges . . . typically have only a passing relationship with actual costs."); *cf.* Cal. Health & Safety Code § 1339.51(b)(1) ("'Charge[master]' means a uniform schedule of charges represented by the hospital as its gross billed charge for a given service, or item, regardless of payer type."). During the relevant years in this case, FSM billed Aetna—and all other commercial insurers—the same rate from this list for any given procedure. Aetna's Resp. FSM/FSA's Joint Statement Facts ¶ 64.

Huntingdon Valley (via FSM) can mostly set these rates as it sees fit. That is, Pennsylvania (and almost every other state) neither restricts how a provider sets these rates nor obligates it to discount or adjust them. *See* Kongstvedt, *supra*, at 134 ("[H]ospitals, like all providers, are free to charge whatever they want in their chargemasters, at least for private-pay patients and commercial payers."); *cf. Howell v. Hamilton Meats & Provisions, Inc.*, 257 P.3d 1130, 1142 (Cal. 2011) ("Chargemaster prices for a given service can vary tremendously, sometimes by a factor of five or more, from hospital to hospital in California.").

FSM thus did not knowingly misrepresent Huntingdon Valley's billed charges. By billing Aetna the chargemaster rate for a given procedure, it submitted the rate that Huntingdon Valley was supposed to submit under the Beech Street and MultiPlan contracts. *See* HVSC's Beech Street Contract, Aetna Ex. 37 (describing Huntingdon Valley's "usual billed charges" as "HVSC billed charges & fee schedule"); HVSC's MultiPlan Contract, Aetna Ex. 36 (defining

"Billed Charges" as "the fees for a specified health care service or treatment routinely charged by [Huntingdon Valley] regardless of payment source"). Indeed, it submitted this same rate for a given procedure to all commercial insurers. Further, this chargemaster rate—unlike the actual charge in the Medicare example—was a rate that it was not obligated to discount or adjust. After FSM submitted this rate as the billed charge, Aetna trimmed it to set the allowed amount. It multiplied this rate by 80% (Beech Street) or by 75% (MultiPlan). Or it applied another method under the patient's plan to calculate the allowed amount. *See, e.g.*, Aetna-MultiPlan Contract, Aetna Ex. 34 (non-exclusive agreement stating that Aetna "*may* access the discounted rates made available to MULTIPLAN" (emphasis added)). From this allowed amount set by Aetna itself based on its out-of-network payment options, it calculated its own payment obligation by deducting the member's co-payment, co-insurance, or deductible. As for the member's portion of this allowed amount—the member's co-payment, co-insurance, or deductible—Aetna has not cited any evidence that FSM ever represented to Aetna that it would collect it.[15]

The situation would be different if FSM were representing the $10,000 billed charge as the "actual charge" that it intends to collect between Aetna and the member rather than the "usual billed charges" or "Billed Charges" as set forth in the contracts. In that case, Aetna would not then trim that number to set the allowed amount based on its available options; it would rightfully assume that FSM is collecting the member's portion and rely exclusively on FSM's proffered actual charge to calculate its own payment obligation. It would assume that FSM intends to collect $5,000 or 50% from it and $5,000 or 50% from the member. As a result, if FSM routinely waived the member's $5,000, FSM has misrepresented the actual charge and

---

[15] It has also cited no evidence that FSM had a contractual or other obligation to Aetna to collect these payments.

caused Aetna to overpay. If Aetna had known that FSM actually intended to collect only $5,000, it would have paid 50% of that number ($2,500). That situation, though, is not present here.

FSM, of course, is incentivized to set high chargemaster rates—and it allegedly did. That is because when Aetna pays a claim under the Beech Street or MultiPlan arrangements, it calculates the allowed amount by multiplying the chargemaster rate by 80% or 75%. It then pays a portion of that number. In fact, although FSM claims to have set the chargemaster rates based on the average rates in Huntingdon Valley's zip code, Aetna has presented evidence that those rates were up to three times the average rates in the area. But that is not insurance fraud.

For these reasons, I will grant summary judgment to FSM on Count III and also to FSM and FSA on Count IV, which is Aetna's claim for aiding and abetting insurance fraud.

### C.    Tortious Interference with Contract

In Count V, Aetna claims that FSM and FSA tortiously interfered with the physician-owners' Aetna provider contracts by wrongly inducing the physicians to breach those contracts. FSM and FSA have moved for summary judgment on this claim, contending that Aetna cannot show that the physician-owners ever breached those contracts.[16] They have not, however, met their burden of production on summary judgment, and so I will deny their motions on this claim.

Under the common formulation of this claim's elements, a plaintiff must prove (1) the existence of a contractual relation between itself and a third party; (2) purposeful action by the defendant specifically intended to harm the existing contractual relation; (3) the absence of privilege or justification on the defendant's part; and (4) actual legal damage. *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pennsylvania*, 7 A.3d 278, 288–89 (Pa. Super. Ct. 2010).

---

[16] On this claim, FSM and FSA have relied almost exclusively on Huntingdon Valley's argument in its motion for summary judgment by incorporating that section of Huntingdon Valley's motion into their own motions.

This formulation does not explicitly require the plaintiff to show that the third party breached the contract, but such a showing is required to establish the claim.  "The Pennsylvania Supreme Court has explicitly adopted the standard of the Restatement (Second) of Torts § 766 (1979) for determining the elements for tortious interference with existing contractual relationships." *Nathanson v. Med. Coll. of Pennsylvania*, 926 F.2d 1368, 1388 (3d Cir. 1991). Section 766 includes the defendant's causing the third party to breach the contract at issue:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766 (1979).  Indeed, "Section 766 addresses disruptions caused by an act directed not at the plaintiff, but at a third person: the defendant causes the promisor to breach its contract with the plaintiff." *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 660 (3d Cir. 1993).

Aetna, in effect, has thus asserted twenty-two separate claims of tortious interference with contract against FSM and FSA.  In Count V, it argues that they are liable for tortious interference for wrongly inducing all twenty-two physician-owners to breach their Aetna provider contracts.  To be sure, it alleges that FSM and FSA induced the physician-owners to breach their contracts in the same way: by increasing their individual equity stakes in Huntingdon Valley (and thus monthly distributions) based on their referral volume of Aetna members.  *See Ira G. Steffy*, 7 A.3d at 288 (requiring plaintiff to show for the second element purposeful action by the defendant specifically intended to harm the existing contractual relationship).  Each physician-owner, though, had his or her own separate provider contract with Aetna, one that he or she entered into at a different time than the others.  Moreover, while many

of the physician-owners' contracts contained similar or identical provisions, whether they actually breached those provisions turns on the actions of each individual physician-owner.

FSM and FSA argue that Aetna cannot establish that the physician-owners breached their provider contracts by referring patients out-of-network to Huntingdon Valley.  As the moving party on a claim on which Aetna bears the ultimate burden of proof, FSM and FSA assume only a burden of production, which they can discharge in two ways.  First, they can produce evidence that negates an essential element of Aetna's claim.  Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. Second, they can "show[]" that the record is devoid of evidence supporting Aetna's claim.  Fed. R. Civ. P. 56(c)(1)(B); *Celotex*, 477 U.S. at 325.  They can show this by "pointing out to the district court . . . that there is an absence of evidence to support [Aetna's] case." *Celotex*, 477 U.S. at 325.

FSM and FSA have endeavored futilely to produce evidence proving that the physician-owners complied with their Aetna contracts—that is, that they did not breach them.  They first highlight how each contract provides a version of the following provision: "Provider shall render services to Members only at those inpatient, extended care, and ancillary service *facilities* which have been *approved in advance* by [Aetna]."  *E.g.*, Barmat Provider Contract, Huntingdon Valley Ex. 16, ¶ 1.3 (emphases added).  They next offer evidence supposedly proving that the physician-owners all complied with this provision.

They contend that Aetna approved of Huntingdon Valley as an out-of-network facility because the physician-owners brought Aetna members to Huntingdon Valley since 2003 and Aetna paid portions of these members' bills without objection.  They cite physician-owner Dr. Robert Mannherz's statement in a declaration that "[s]ince 2003, Aetna members who were treated at the Surgery Center . . . were treated on an out of network basis.  Aetna paid at least a

portion of the fees billed to it with respect to these patients." Mannherz Decl. ¶ 26. They also cite the declaration statement of Tracy Malloy, Office Manager at Huntingdon Valley, that "Aetna has not paid the Surgery Center the full amount of its billings, but, until this litigation, has never objected to the Surgery Center regarding the amount of the Surgery Center's charges, or to the fact that a particular procedure was going to be done at the Surgery Center." Malloy Aff. ¶ 7.

Yet even if assumed to be true, these statements standing alone do not establish that Aetna approved of Huntingdon Valley as an out-of-network facility for all twenty-two of the physician-owners (or any, for that matter). Aetna could have paid portions of those bills without objection for reasons other than its approval of Huntingdon Valley as an out-of-network facility. So rather than proving as an undisputed fact that the physician-owners did not breach their contracts, FSM and FSA have identified on the record genuine issues of material fact. By paying portions of the bills since 2003 without objection, did Aetna approve of Huntingdon Valley as an out-of-network facility? Or did Aetna pay portions of these bills without objection for another reason?

FSM and FSA also assert that Aetna approved of Huntingdon Valley as an out-of-network facility because Aetna issued pre-certifications for some of the procedures performed there. In essence, they argue that if Aetna issued these pre-certifications, then it approved of Huntingdon Valley.

But they cite conflicting evidence on this point. On the one hand, they cite two "eTUMS Event Profile Reports" prepared by Aetna that reflect Aetna's pre-certification of two procedures that were to be performed at Huntingdon Valley. Reports, Huntingdon Valley Exs. 38–39. Each report names Huntingdon Valley as a "non-preferred Provider," though one lists physician-owner

25

Dr. Stephen G. Somkuti as the doctor and the other lists physician-owner Dr. Mannherz.  These reports also confirm that the members' plans provide out-of-network benefits that will cover the procedures.  In addition, the report for Dr. Mannherz describes three in-network providers that can also perform the procedure, and how many miles they are located from the member.[17]  On the other hand, they cite deposition testimony from Kleman, the Aetna executive, in which he explains "pre-certification" as the process whereby Aetna only confirms that the procedure or service is covered by the member's plan.  Kleman Dep., Huntingdon Valley's Ex. 52, 78:3-78:22.  Kleman said that some members' plans "require[] that a service identified as needing pre-certification or pre-authorization must be called in to Aetna in advance to confirm whether or not that service is covered under the member's plan."  *Id.*

This conflicting evidence does not establish that there is no genuine issue of material fact that Aetna approved of Huntingdon Valley.  Instead, it raises genuine issues of material fact.  By issuing a pre-certification, did Aetna approve of Huntingdon Valley as an out-of-network facility?  Or did a pre-certification mean only that a patient's procedure or service was covered under his or her plan?  If it meant that Aetna approved of Huntingdon Valley, does Aetna's pre-certification of two procedures performed by two different physician-owners establish that Aetna approved of Huntingdon Valley for all of the physician-owners?  Or does it prove only that Aetna approved of Huntingdon Valley for those physician-owners for those two procedures?

As a result of these genuine issues of material fact, I will deny FSM and FSA's motion for summary judgment on Count V.

### D.  Civil Conspiracy

---

[17] FSM and FSA also generally cite a fifty-nine page spreadsheet that shows that at least some of the procedures performed at Huntingdon Valley were pre-certified.  This spreadsheet, however, does not even state whether it was Aetna that pre-certified these procedures.

In Count II, Aetna claims that FSM and FSA engaged in a civil conspiracy to pay illegal kickbacks to the physician-owners, commit insurance fraud, and tortiously interfere with the physician-owners' provider contracts. To establish a cause of action for civil conspiracy, a plaintiff must prove the following: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt action done in pursuance of the common purpose, and (3) actual legal damage." *Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. Ct. 2008). "In addition, 'absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." *Id.* (quoting *McKeeman v. Corestates Bank*, 751 A.2d 655, 660 (Pa. Super. Ct. 2000)).

FSM and FSA argue only that they are entitled to summary judgment because Aetna cannot establish any underlying civil cause of action. That argument must fail given that I have denied them summary judgment on the tortious interference with contract claim. So I will also deny them summary judgment on this claim.

### E.    Equitable Relief

In Count VIII, Aetna requests injunctive relief to accompany its claims that FSM and FSA violated section 4117(b)(2) (anti-kickback) and section 4117(a)(2) (insurance fraud). Specifically, it asks that I compel FSM and FSA to stop waiving Aetna members' payments to induce them to treat at Huntingdon Valley and to stop paying kickbacks to the physician-owners, and that I require them to notify all Aetna members when the referring physician has an ownership stake in their facilities and to offer the members alternative in-network facilities. Because I am granting summary judgment to FSM and FSA on the underlying claims, I will also grant summary judgment to them on this accompanying claim for equitable relief.

F.     **Equitable Accounting**

In Count IX, Aetna seeks an equitable accounting under Pennsylvania law based on "the numerous allegations of fraud and misrepresentation relating to Defendants' billing practices, including the payments and incentives offered to physicians and patients who use Huntingdon Valley." Aetna's Am. Compl. ¶ 101.  It contends that the "nature and complexity of the scheme engaged in by Defendants" leaves it with no remedy to assess the scope of the scheme.  *Id.*  It thus argues that it is entitled to an accounting as to (1) the identity of all Aetna members for whom FSM and FSA waived their out-of-pocket payments; (2) all payments provided to the physician-owners to incentivize them to refer Aetna members to Huntingdon Valley; and (3) all money conferred on FSM and FSA as a result of their illegal billing practices." *Id.* ¶ 102.

This claim cannot survive.  "An equitable accounting is improper where no fiduciary relationship exists between the parties, no fraud or misrepresentation is alleged, the accounts are not mutual or complicated, *or* plaintiff possesses an adequate remedy at law."  *Rock v. Pyle*, 720 A.2d 137, 142 (Pa. Super. Ct. 1998).  "Equitable jurisdiction for an accounting does not exist merely because the plaintiff desires information that [it] could obtain through discovery."  *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1124 (Pa. Super. Ct. 1987).  Here, Aetna has alleged fraud and misrepresentation but only in connection with its now-deflated claims that FSM and FSA violated section 4117(b)(2) (anti-kickback) and section 4117(a)(2) (insurance fraud).  It has also not offered any evidence of a fiduciary relationship between itself and FSM and FSA.  Finally, through discovery, it had ample time and opportunity to gain the information it now seeks with an accounting.  In fact, it seems to have unearthed a significant amount of this information.  As a result, I will grant summary judgment to FSM and FSA on this claim.

28

### G.    Personal Jurisdiction Over FSA

FSA has moved for summary judgment based on lack of personal jurisdiction, a defense that it also raised in its earlier motion to dismiss.  Because FSA and Aetna have raised the same disputed issues of material fact as they did on FSA's earlier motion to dismiss, I will deny FSA's motion here.  Before trial, however, a court must hold an evidentiary hearing so that it can resolve these disputed issues of material fact and answer this open question.

"Rule 4(e) of the Federal Rules of Civil Procedure is the starting point [for analyzing personal jurisdiction]."  *Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 200 (3d Cir. 1998).  "This rule authorizes personal jurisdiction over non-resident defendants to the extent permissible under the law of the state where the district court sits."  *Id.*  (quotation mark omitted).  Under Pennsylvania's long-arm statute, 42 Pa. Cons. Stat. Ann. § 5322, a Pennsylvania court may "exercise personal jurisdiction over nonresident defendants to the constitutional limits of the due process clause of the fourteenth amendment."  *Mellon Bank (East) PSFS, Nat'l Assoc. v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992).  Aetna must therefore show that FSA is subject to either general or specific personal jurisdiction in Pennsylvania.  *Id.*

"General jurisdiction is invoked when the plaintiff's cause of action arises from the defendant's non-forum related activities."  *North Penn Gas Co. v. Corning Nat'l Gas Corp.*, 897 F.2d 687, 690 n.2 (3d Cir. 1990).  That is, if a defendant is subject to general personal jurisdiction in a state, "that party can be called to answer any claim against [it], regardless of whether the subject matter of the cause of action has any connection to the forum."  *Mellon Bank*, 960 F.2d at 1221.  To be subject to general jurisdiction in a state, a corporation must have contacts with the forum state that are "so continuous and systematic as to render [it] essentially at

home [there]." *Goodyear Dunlop Tires Operations v. Brown*, 131 S. Ct. 2846, 2851 (2011) (quotation marks omitted).

By contrast, "[s]pecific jurisdiction is invoked when the cause of action arises from the defendant's forum related activities." *North Penn Gas Co.*, 897 F.2d at 690.  Since the Supreme Court's decision in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), "specific jurisdiction has become the centerpiece of modern jurisdictional theory, while general jurisdiction plays a reduced role." *Goodyear*, 131 S. Ct. at 2854 (citation omitted).  To be subject to specific personal jurisdiction in a state, the defendant must have "purposefully directed [its] activities at the forum," and "the litigation must arise out of or relate to at least one of those activities." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007) (citations omitted) (quotation marks omitted).[18]  If these requirements are met, "a court may consider whether the exercise of jurisdiction otherwise comport[s] with fair play and substantial justice." *Id.* (citations omitted) (quotation marks omitted).

FSA raised this personal jurisdiction defense in its earlier motion to dismiss.  When a defendant claims lack of personal jurisdiction in a motion to dismiss, the "plaintiff bears the burden of demonstrating the facts that establish personal jurisdiction." *Pinker v. Roche Holdings*, 292 F.3d 361, 368 (3d Cir. 2002).  But in responding to a motion to dismiss for lack of personal jurisdiction, "[i]f the district court does not hold an evidentiary hearing, the plaintiff[] need[s] only to establish a prima facie case of personal jurisdiction." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 331 (3d Cir. 2009) (quotation mark omitted).  In addition, "a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff." *Id.*  "Of course, by accepting a plaintiff's facts as true when a motion to dismiss is

---

[18] "Agency relationships . . . may be relevant to the existence of specific jurisdiction." *Daimler*, 134 S. Ct. at 759 n.13.

30

originally made, a court is not precluded from revisiting the issue if it appears that the facts alleged to support jurisdiction are in dispute." *Id.* (quoting *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992)). "Eventually . . . the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pre-trial evidentiary hearing or at trial." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981); *see also Carteret*, 954 F.2d at 142 n.1 (stating that "if court does not conduct evidentiary hearing on motion to dismiss for lack of in personam jurisdiction, plaintiff need only plead prima facie case to survive initial motion, but must eventually establish jurisdiction by a preponderance of the evidence").

In its motion to dismiss, FSA argued that it has no contacts whatsoever with Pennsylvania, relying on the declaration of Marcelo Puiggari, an FSM executive. He stated that FSA is a Nevada LLC with its principal place of business in Oklahoma, and that it has no employees. He asserted that it is a holding company only, with no direct Pennsylvania contacts. He averred that it has no Pennsylvania bank accounts, property, business licenses, and so on. According to Puiggari, FSA's only contacts with Pennsylvania are indirect: it is the sole member of FSM (the other defendant) and of Foundation Surgery Holdings, LLC, which is the entity that owns 20% of Huntingdon Valley.

Aetna responded with evidence that FSA is not a mere holding company but rather a direct and active participant in the Pennsylvania health care market. It offered evidence such as an investor-targeted document from the website of FSA's parent company stating that "Foundation Surgery Affiliates, LLC" operates a chain of ambulatory surgery center facilities in Pennsylvania," and numerous emails relating to the day-to-day management and strategy of Huntingdon Valley from persons with "FSA.mail" domain addresses and signature blocks identifying them as having positions with FSA.

In resolving the motion to dismiss, I held that Aetna had carried its burden. Because I had not conducted an evidentiary hearing, Aetna bore only the burden of establishing a prima facie case of personal jurisdiction over FSA. Accepting all of Aetna's allegations as true and construing all disputed facts in its favor, I concluded that Aetna had shown a prima facie case that FSA had purposefully directed its activities at Pennsylvania, and that this case had arisen out of at least one of those activities.

Now, at summary judgment, FSA has again raised its personal jurisdiction defense. But neither it nor Aetna has offered any new evidence. FSA argues that it is only a holding company with no direct contacts with Pennsylvania, and that its only contacts with Pennsylvania are indirect through its ownership of FSM and of Foundation Surgery Holdings, LLC. For support, it relies on the declaration of an FSM employee, this time Daryl Royer. Aetna responds with evidence that FSA is a direct and active participant in the Pennsylvania health care market. For support, it relies on the same evidence it presented at the motion to dismiss stage.

In effect, then, I am in a similar position now as I was in ruling on the motion to dismiss. FSA has presented the same evidence on the issue; Aetna has responded with the same contrary evidence. I have not held an evidentiary hearing. Further, at the summary judgment stage, I must construe all disputed facts in favor of Aetna and draw any justifiable inferences in its favor. *See Liberty Lobby*, 477 U.S. at 255 ("[At summary judgment] [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."). As a result, there are genuine issues of material fact on this question, and the court will deny FSA's motion for summary judgment based on lack of personal jurisdiction.

The court will, however, hold a pre-trial evidentiary hearing to resolve the disputed issues of material fact at which Aetna must establish by a preponderance of the evidence that personal jurisdiction exists over FSA.[19]

---

[19] I note that, if Aetna fails to make such a showing and FSA is thus dismissed from the case, Aetna's civil conspiracy claim (Count II) against FSM will not automatically fail even though FSM will then be the sole defendant.  *Cf. United States v. Obialo*, 23 F.3d 69, 72 (3d Cir. 1994)  (stating in the criminal context that alleged coconspirators do not all need to be joined in the same action); *see also US Investigations Servs., LLC v. Callihan*, No. 2:11-cv-00355, 2012 WL 933069, at *2 (W.D. Pa. Mar. 19, 2012) ("In order for one member of a civil conspiracy to be liable, not all members of the conspiracy need be named as defendants or joined as defendants.").